**BRISTOL–MYERS SQUIBB COMPANY, Plaintiff,**

v.

**McNEIL–P.P.C., INC., Defendant.**

**No. CV 91–1826 (ADS).**

United States District Court,
E.D. New York.

Feb. 20, 1992.

Milgram Thomajan & Lee, P.C., New York City, for plaintiff; Samuel D. Rosen, Lawrence I. Weinstein, Alfred T. Lee, Brendan J. O'Rourke, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendant; Gregory L. Diskant, Stephen P. Younger, of counsel.

## OPINION AND ORDER

SPATT, District Judge.

In reviewing this case, the Court finds that the caption might more appropriately read the "Clash of the Titans." These two pharmaceutical giants have manufactured and produced some of the most reputable products sold, not only in this country, but around the world.

In particular, two brand names intimately connected to these companies are known to virtually every household in America—EXCEDRIN and TYLENOL. These two products have come to be identified with what is often perceived to be a peculiarly national phenomenon—the great American "headache"—a multi-million dollar industry.

What makes this action both interesting and difficult is that the issues go to the heart of the free enterprise system—the ability and the right to compete in the marketplace, a principle that historically has formed part of the foundation of our nation and its society. However, the right to compete is not unbridled.

This dispute concerning trademark and trade dress infringement focuses upon two individual products—EXCEDRIN PM and TYLENOL PM—which are part of the family of over-the-counter analgesics sold respectively by the plaintiff and defendant, recommended for nighttime application. The case is before the Court at this time to review the objections filed by both parties to the Report and Recommendation of the United States Magistrate Judge who, after conducting an evidentiary hearing on Bristol–Myers' request for a preliminary injunction on its trademark and trade dress infringement claims, recommended against the issuance of such an injunction.

188

## I. PRELIMINARY STATEMENT

The plaintiff Bristol–Myers Squibb Company ("Bristol–Myers") moves for a preliminary injunction, seeking to enjoin the defendant McNeil–P.P.C. Inc. ("McNeil") from using, selling, offering for sale, and distributing "analgesic products in any trade dress which 'simulates the trade dress of EXCEDRIN PM,'" and from any use of the packaging or the "PM" mark for analgesic products. The plaintiff also seeks an order directing defendant McNeil to recall all such products, packaging, and advertising bearing the TYLENOL PM trade dress and "PM" mark and to deliver up for destruction all packaging, labels, ads, and printing plates with the "PM" mark.

Before the Court at this time is the Report and Recommendation of United States Magistrate Judge Michael L. Orenstein, in which he declined to recommend the issuance of a preliminary injunction on the grounds that the plaintiff Bristol–Myers has failed to demonstrate (1) irreparable harm, and (2) either likelihood of success on the merits or sufficiently serious questions going to the merits, wherein the balance of the hardships would tip decidedly in favor of Bristol–Myers (RR at pp. 95–96).[1] Since objections were timely filed by both parties, the Court now undertakes a *de novo* determination of the matter. The Court further notes that upon the application of the plaintiff, the Court granted oral argument on the objections which was heard on October 4, 1991.

For the reasons set forth below, the Court confirms and adopts the Magistrate Judge's recommendation in part, but respectfully declines to accept the recommendation denying the plaintiff's application for a preliminary injunction, and, instead, grants the plaintiff's application. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) (*see also Weitzman v. Stein*, 897 F.2d 653, 658 [2d Cir.1990]).

## II. THE FACTS

The factual background in this action is rather lengthy and complex and, in this decision, the Court recites only those facts relevant to the application for a preliminary injunction.

Bristol–Myers is a Delaware corporation with its principal place of business in New York City. For many years prior to this suit, Bristol–Myers has been engaged in the development, production and marketing of over-the-counter ("OTC") medicinal preparations, including such well-known brands as EXCEDRIN, EXCEDRIN PM, BUFFERIN, and NUPRIN. EXCEDRIN PM, the subject of this suit, is a dual relief product, a combined analgesic and sleep aid which Bristol–Myers has sold for more than twenty years. Bristol–Myers obtained its trademark for EXCEDRIN PM in June, 1990.[2]

As a direct result of the apparent quality of its EXCEDRIN PM analgesic/sleep aid product, its extensive advertising and promotional activities, and its substantial sales of the product, Bristol–Myers has acquired an outstanding reputation and acceptance among the public for this product. In fact, it is conceded by the defendant McNeil that EXCEDRIN PM is currently the "largest selling analgesic/sleep aid product in the United States" (Answer, ¶ 7).

Historically, EXCEDRIN PM has been sold in light blue tablet form with a distinctive trade dress encompassing the package layout and design as well as the labels on the inner bottles. That unique trade dress includes: an outer carton with deep blue background; white lettering for the EXCEDRIN PM trademark displayed on the upper half of the carton, with the prominent use of the "PM" letters immediately following the EXCEDRIN name; yellow and white lettering for the other wording on the carton; depiction of the light blue tablets at the lower right-hand portion of the carton; the benefit line with the phrase

1. "RR at p. ___" refers to the pages of the Report and Recommendation of the Magistrate Judge, dated August 5, 1991.

2. EXCEDRIN PM was registered with the U.S. Patent and Trademark Office as an analgesic/sleep aid on June 30, 1970; the registration was renewed on June 14, 1990.

"FOR PAIN WITH ACCOMPANYING SLEEPLESSNESS"; a plastic bottle inside the carton with a label essentially repeating the distinctive EXCEDRIN trade dress of the outer carton; and light blue tablets imprinted with the letters "PM".

In 1988, Bristol–Myers introduced a caplet form of the EXCEDRIN PM product. The packaging for this form is identical to that of the tablet packaging with the following exceptions: the outer carton and bottle label have a green background; at the lower right of the package, light blue caplets appear instead of tablets; and the caplets display the full EXCEDRIN PM trademark.

The defendant McNeil is a New Jersey Corporation with its principal place of business in Fort Washington, Pennsylvania. McNeil markets the leading line of analgesic products in the United States under the TYLENOL trademark. In mid–1991, McNeil introduced a pain reliever/sleep aid product which it named "TYLENOL PM." It has recently filed a federal trademark application for the TYLENOL PM mark (Answer, ¶ 22). McNeil also states that it has informed the trade of its projection for $50 million in sales of TYLENOL PM during its first year (Answer, ¶ 17).

Both EXCEDRIN PM and TYLENOL PM contain essentially the same ingredients, namely, 500 mg of acetaminophen. EXCEDRIN PM also contains 38 mg of diphenhydramine citrate while TYLENOL PM contains 25 mg of diphenhydramine HCL.

The outer carton of the TYLENOL PM caplets product is predominantly dark blue with a gradual fade to medium blue at the bottom of the carton. The trademark "TYLENOL" appears in white capital letters immediately followed by the yellow letters "PM". Below the product name line, the word "Caplets" appears in yellow next to the benefit line which states "For pain with sleeplessness." At the lower right hand portion of the carton, McNeil has depicted two light blue caplets, imprinted with the TYLENOL PM product name.

McNeil has also introduced a tablet variety of TYLENOL PM. Its carton is predominantly dark green with a gradual fade to teal green at the bottom. All other characteristics of the caplet package previously described are present in the tablet package. The only difference is the appearance of two tablets at the lower right hand corner; these tablets are also of a light blue color and show the name "TYLENOL" on one with "PM" on the other.

Bristol–Myers contends that McNeil is advertising, distributing and selling TYLENOL PM in a manner which "simulates the EXCEDRIN PM trade dress, in color, layout, design and other graphic elements, including prominent use of the letters PM on the packaging ... thus usurping the distinctive trade dress and trademark long associated with Bristol's EXCEDRIN PM product." Bristol–Myers further contends that McNeil has done so with the "object and intent ... to misappropriate the goodwill and consumer recognition" of EXCEDRIN PM (Complaint, ¶¶ 21, 24).

Bristol–Myers filed its complaint on May 21, 1991, alleging the following causes of action: (1) trademark and trade dress infringement under the Lanham Act; (2) dilution of the EXCEDRIN PM trade dress and mark in violation of New York General Business Law § 368–d; (3) unfair competition and deceptive acts and trade practices in violation of New York General Business Law § 349; (4) misappropriation of Bristol–Myers' goodwill and consumer recognition for the EXCEDRIN PM trade dress and mark under New York law and the statutory and common law of other states; and (5) common law trade dress and trademark infringement in New York and other states.

In its Answer, McNeil asserted the following affirmative defenses: (1) Bristol–Myers' action is barred by the doctrines of waiver, laches and estoppel; (2) the complaint fails to state a cause of action; (3) the defendant's actions were taken in good faith, with no intention to violate any laws or rules; (4) the plaintiff has failed to enforce its claimed trade dress or trademark interest; and (5) McNeil's actions are protected by the doctrine of fair use.

## III. PROCEDURAL SETTING

The motion for a preliminary injunction was brought on by order to show cause, signed by this Court on May 21, 1991. Pursuant to 28 U.S.C. § 636(b)(1), the matter was referred to the United States Magistrate Judge, to conduct an evidentiary hearing and to issue a Report and Recommendation. The Magistrate Judge thereafter conducted a hearing which began on June 4, 1991 and extended intermittently over a period of twelve (12) days. The testimony resulted in a transcript in excess of 2,400 pages, with more than 16,000 pages of exhibits.

On August 5, 1991, the Magistrate Judge issued his Report and Recommendation, finding that although the trade dress for EXCEDRIN PM had acquired secondary meaning, Bristol–Myers failed to demonstrate either likelihood of confusion or sufficient bad faith necessary to create a "presumption" of likelihood of confusion, and failed to show that it would suffer irreparable harm absent an injunction (RR at pp. 71, 93–94). The following Recommendation was made to the Court:

> "[a]fter giving serious consideration to each of the *Polaroid* factors and after a careful weighing of all the evidence presented, plaintiff's application under 15 U.S.C. § 1125(a) for a preliminary injunction is denied.

> \* \* \* \* \* \*

> Based on the foregoing discussion of the law and facts, I find that the plaintiff has failed to demonstrate a) irreparable harm, and b) either likelihood of success on the merits or sufficiently serious question going to the merits wherein the balance of the hardships tip[s] decidedly in Bristol's favor. Accordingly, I recommend that the application for a preliminary injunction be denied" (RR at pp. 71–72, 95–96).

The plaintiff thereafter filed timely objections to the Report and Recommendation on August 23, 1991. Essentially, Bristol–Myers took exception to the following findings of the Magistrate Judge: (1) no imitative intent on the part of McNeil; (2) absence of actual confusion; (3) rejection of

Bristol–Myers' two consumer surveys showing "extensive actual confusion" in regard to the source and sponsorship of McNeil's products; (4) "PM" is a "descriptive" rather than a "suggestive" mark; and (5) although Bristol–Myers trade dress has secondary meaning as required under the New York "anti-dilution" statute, Bristol–Myers failed to produce sufficient evidence of predatory intent.

The defendant McNeil also filed timely objections on August 23, 1991. While agreeing with the ultimate conclusion of the Magistrate Judge, McNeil contends that he erred in finding that the EXCEDRIN PM trade dress had acquired "secondary meaning." The defendant also objects to certain subsidiary findings relating to the absence of confusion, although it readily accepts the finding of the Magistrate Judge that there was a lack of actual confusion.

In a related issue, McNeil states that although the "Magistrate Judge did not have occasion to reach additional arguments made by McNeil with respect to irreparable injury premised upon Bristol's unexcused delay in instituting this action and on certain other issues ... McNeil preserves its arguments in the event it is necessary that they be reached" (Objections of Defendant McNeil–P.P.C. Inc. at p. 4).

## IV. THE APPLICABLE LAW

Before turning to the merits of the application, at the outset, the Court examines the applicable standards in reviewing the Report and Recommendation of the Magistrate Judge and with regard to the motion for a preliminary injunction.

### A. *Review of the Report and Recommendation of the Magistrate Judge*

 Pursuant to 28 U.S.C. § 636(b)(1), any party may file written objections to the Report and Recommendation of the Magistrate Judge within ten days after being served with a copy (*see also* Fed.R.Civ.P. 72[a]). Failure to object results in a waiver (*see Small v. Secretary of Health and*

*Human Servs.*, 892 F.2d 15, 16 [2d Cir. 1989] [per curiam]). Once objections are filed, however, the district court is required to make a *de novo* determination as to those portions of the Report and Recommendation to which objections were made (*see* 28 U.S.C. § 636[b][1]; *Grassia v. Scully*, 892 F.2d 16, 19 [2d Cir.1989]). Although the district court may "receive further evidence or recommit the matter to the magistrate with instructions" (28 U.S.C. § 636[b][1]), a *de novo* determination does not require the recalling of witnesses (*see United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 [1980]). Rather, in making such a determination, the district court may, in its discretion, review the record and hear oral argument on the matter (*see Pan Am. World Airways, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 894 F.2d 36, 40 n. 3 [2d Cir.1990]).

Objections to the Report and Recommendation having been timely filed, the Court reviewed the record and thereafter granted the parties' request for oral argument.

On October 4, 1991, the date of oral argument, the parties transformed the courtroom into a would-be supermarket and typical pharmacy aisle to reflect a certain "planogram"[3] related to the placement of analgesic products. The Court accepted several additional exhibits for filing. In this regard, the Court notes that neither party requested an opportunity to present additional testimony, nor does the Court believe that additional proof is necessary to resolve the present application. Accordingly, the Court bases this *de novo* determination entirely upon the record below, the oral argument of October 4, 1991, and the submissions by the parties.

B. *Standard for the Issuance of a Preliminary Injunction*

■ In order to obtain a preliminary injunction in the Second Circuit, it is well established that the movant must "clearly" establish the required elements set forth in the familiar recitation of the rule as follows:

> "a party seeking a preliminary injunction in this circuit must establish both possible irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see Warner Bros. v. Gay Toys, Inc.*, 658 F.2d 76, 78–79 (2d Cir.1981) [*Jackson Dairy* standard applies in trademark infringement cases]; *see also Western Publishing Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 59 (2d Cir.1990); *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985).

A showing of probable irreparable harm is usually considered the single most important requirement (*see Reuters Ltd. v. United Press International, Inc.*, 903 F.2d 904, 907 [2d Cir.1990] [citations omitted]), and an applicant must establish more than a mere "possibility" of irreparable harm, namely, "that it is *likely* to suffer irreparable harm if equitable relief is denied" (*JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 [2d Cir.1990]).

■ As to the "likelihood of success" element, the movant "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent" (*Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 [2d Cir.1985]).

■ However, in the particular area of trademark infringement, "[a]ssuming that a particular mark warrants protection under the Lanham Act, the requisite likelihood of success on the merits and irreparable harm can both be established by showing a 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or ... simply confused, as to the source of the goods in question'" (*Western Publishing Co. v. Rose Art In-*

---

**3.** See transcript of October 4, 1991 Oral Argument at p. 66. All subsequent references to this record are designated "OA" followed by page references.

*dus., Inc., supra,* 910 F.2d at p. 59 [citations omitted] ).

The issuance of a preliminary injunction, of course, is considered an extraordinary equitable remedy, hence the requirement that entitlement be "clearly" shown (*see Berrigan v. Norton,* 451 F.2d 790, 793 [2d Cir.1971]; *see also* 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2948 [1973 & Supp.1990] [collecting cases] ).

With these basic principles in mind, the Court now turns to the merits of the application for a preliminary injunction.

## C. *Lanham Act*

### i. Generally

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a statutory remedy for trademark or trade dress infringement and unfair competition to a party injured by a competitor's false designation of origin of its product, whether or not the aggrieved party has a registered trademark (*LeSportsac, Inc. v. K Mart Corp., supra,* 754 F.2d at p. 75). Section 43(a) provides an additional remedy for the false or misleading or deceptive advertisement of facts. In short, the Lanham Act provides civil redress to one damaged by unfair competition through false or misleading advertising and/or trademark or trade dress infringement (*see generally* Bauer, *A Federal Law of Unfair Competition: What should be the Reach of Section 43(a) of the Lanham Act?,* 31 UCLA L.Rev. 671, 685–703 [1984] [broad overview of scope and limitations of Lanham Act] ). Section 43(a), as amended, provides in relevant part as follows:

"(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval

of his or her goods, services, or commercial activities by another person, or (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities ... of his ... goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C. § 1125(a).

■ In order to succeed in this action, Bristol–Myers must show that (1) its trademark or trade dress has acquired secondary meaning, and (2) there is a likelihood of confusion as to the source of the product.

### ii. Trademark Infringement: Secondary Meaning

■ As to subdivision (1), eligibility for protection under the Lanham Act depends upon the nature of the mark infringed. In *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9–11 (2d Cir.1976), the Second Circuit set forth the following classifications to determine eligibility for trademark status and the degree of protection accorded: (1) generic [ineligible for protection]; (2) descriptive [eligible for protection with proof of secondary meaning]; (3) suggestive [eligible for protection without proof of secondary meaning]; and (4) arbitrary or fanciful [eligible for protection without proof of secondary meaning and "with ease of establishing infringement"]. However, "categorizing a mark is a 'slippery business' and necessarily turns on 'the particular context of the mark's use, the context of its time of use, and the context of its group of users' " (*Western Publishing Co. v. Rose Art Indus., Inc., supra,* 910 F.2d at p. 60 [citation omitted] ).

■ Section 2(e) of the Lanham Act precludes the Registration of a mark which, when applied to the goods of the applicant is "merely descriptive" (*see Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* at p. 10). However, this provision must be read in conjunction with § 2(f) which states the following:

"Except as expressly excluded in paragraphs (a)-(d) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration."

Whether the "PM" mark has become distinctive and whether it is "descriptive" or "suggestive" is the crux of the first objection raised by Bristol–Myers.

The plaintiff asserts that the "PM" mark is suggestive while McNeil insists that it is descriptive at best. In discussing the *Abercrombie* classifications, the Magistrate Judge applied the analysis and noted the distinctions set forth in *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1435 (S.D.Ohio 1990):

"the district court focused on two factors that distinguish between descriptive and suggestive terms: (1) how much imagination a buyer must use to cull a direct message from the mark about the quality, ingredients or characteristics of the product or service; and (2) whether the trademark directly conveys a real and unequivocal idea of some characteristic, function, quality or ingredient of the product or service to a potential buyer who is not completely familiar with all aspects of the product" (RR at p. 6, *citing Worthington Foods, Inc. v. Kellogg Co., supra*, at 1435).

The Magistrate Judge concluded that "a suggestive mark requires a 'multi-stage reasoning process' on the part of a buyer," while a descriptive mark entails a direct conveyance (*id., citing Worthington, supra*). In determining that the "PM" mark in the context of a pain reliever directly conveys the idea that the product is intended for nighttime use, the Magistrate found

the "PM" mark to be descriptive rather than suggestive (RR at p. 7).

Needless to say, defendant McNeil agrees with this finding. However, plaintiff Bristol–Myers claims that the Magistrate erred, as a matter of law, in holding that "PM" is descriptive and not suggestive.

Claiming that "PM is a classic suggestive, if not fanciful mark," Bristol–Myers stresses that it takes "sequential thinking ... to start with the letters PM, think through and reject their other possible meanings, to convert PM to 'p.m.' ... and then to exclude many of the 12 hours of 'post-meridiem' [sic] time ... in order to arrive at 'nighttime'" (Bristol–Myers Objections at p. 32). The Court disagrees.

Difficulty arises in drawing a line of demarcation between a "descriptive" and a "suggestive" mark. The waters in this case are no less murky. However, the Court takes some solace in the often-quoted response of Judge Learned Hand to the enigma of sorting out these categories:

"It is quite impossible to get any rule out of the cases beyond this: That the validity of the mark ends where the suggestion ends and description begins" (*Franklin Knitting Mills, Inc. v. Fashionit Sweater Mills, Inc.*, 297 F. 247 [S.D.N.Y.1923], *aff'd per curiam*, 4 F.2d 1018 [2d Cir.1923]).

Letters of the alphabet create their own unique trademark problems. Letters may be valid trademarks if they are entirely fanciful and arbitrary, if they have no connection with the article or any of its features, or if they are designed solely to indicate origin; they are not valid if they describe or refer to the article or its characteristics (*G. Heileman Brewing Co., Inc. v. Anheuser–Busch Inc.*, 676 F.Supp. 1436 [E.D.Wis.1987], *aff'd*, 873 F.2d 985 [7th Cir. 1989] ["LA" mark—without periods—as brand name of low-alcohol beer determined to be descriptive mark and not a valid, legally protectible trademark]; *Nature's Bounty, Inc. v. Basic Organics*, 432 F.Supp. 546, 551 [E.D.N.Y.1977] [term "B-100" held merely descriptive as applied to vitamins]; *National Conference of Bar*

*Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478 [7th Cir.1982], *cert. denied sub nom. Multistate Legal Services Studies, Inc. v. Ladd*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 [1983] [phrase "MULTISTATE BAR EXAMINATION" has common descriptive quality, and thus neither that phrase nor the abbreviation "MBE" is entitled to trademark protection]).

■■■■ The odds of attaining a solid mark status with an abbreviation are poor. (ROGER MILGRIM, § 9.04[3][b] MILGRIM ON TRADE SECRETS at 9–152 [1991]). Although one cannot claim an exclusive right to the use of a numerical or alphabetical system (RUDOLF CALLMANN, § 18.23 THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES at 210 [1991]), descriptive marks are eligible for trademark status once they become well associated as a distinctive source of the product (MILGRIM at 9–148, § 9.04[2][b][i]).

■■■■ A monopoly on letters of the alphabet cannot be secured by registration of a trademark. However, a manufacturer may not choose a single combination of letters that so closely approximates the combination of another producer, which, when used on goods of the same descriptive properties is likely to cause confusion (*Vitamin Corp. of America v. American Home Products Corp.*, 166 F.2d 203, 35 C.C.P.A. 952 [1948]). Under trademark law, an abbreviation, like any other unregistered mark, will only be protected if it has acquired secondary meaning (*see Continental Corrugated Container Corporation v. Continental Group, Inc.*, 462 F.Supp. 200, 204 [S.D.N.Y.1978]).

■■■■ A mark has acquired secondary meaning when it "has been used so long and so exclusively by one producer with reference to its article that, in that trade and to that branch of the purchasing public, the word or phrase has come to mean that the article was the first producer's trademark" (*G. Heileman Brewing Co. v. Anheuser–Busch Inc., supra*, 676 F.Supp. at p. 1467 [citations omitted]). While the Court finds this principle directly applicable

to "EXCEDRIN PM," it does not reach the same conclusion with regard to the "PM" designation standing alone. In addition, the Court agrees with the finding of the Magistrate Judge that Bristol–Myers has failed to meet the "heavy burden" of showing that the efforts undertaken to associate the "PM" indicator with one source have been effective (*see 20th Century Wear v. Sanmark–Stardust, Inc.*, 815 F.2d 8, 10 [2d Cir.1987]).

The Court concurs that the "PM" mark, standing alone, is not entitled to trademark protection. "Whether a single letter or group of letters always used as part of a composite mark functions separately as a mark depends upon the probable impact upon the consumer" (1 J. McCarthy, *Trademarks and Unfair Competition*, § 7.2, at 183 [2d ed. 1984]). On this record, there is insufficient evidence of consumers selecting Bristol–Myers' analgesic-plus-sleeping-aid solely by recognition of the "PM" designator or by instantaneous recognition of the source of the product on the same basis. Further, there is no evidence that Bristol–Myers has "ever marketed its product to the public as 'PM'" (RR at p. 11).

The Court therefore confirms and adopts the finding of the Magistrate Judge that the "PM" mark alone is not entitled to trademark protection.

### iii. Trade Dress Infringement: Secondary Meaning

■■■■ Aside from the infringement claim as to the use of the PM designator, the Court must also determine whether the packaging and advertising of the defendant's TYLENOL PM product constitutes trade dress infringement of the plaintiff's EXCEDRIN PM product. The Magistrate Judge found that the full EXCEDRIN PM trade dress met all of the criteria for an arbitrary or fanciful mark (RR at p. 8). The Court confirms and adopts that finding.

■■■■ The "trade dress" of a product (i.e., "total image of a product"), may be eligible for protection under section 43(a) if it has acquired a "secondary meaning" in

the marketplace. Trade dress infringement actions usually involve the packaging or labeling of a product, but may also encompass the design of a product itself (*LeSportsac, supra,* 754 F.2d at p. 75).

This Court recently had the opportunity to summarize the elements of a trade dress infringement action under the Lanham Act, as follows:

> "In order to recover for a trade dress infringement under section 43(a), [plaintiff] must establish: (1) that its trade dress has acquired secondary meaning in the marketplace as to the source of the product; *and,* (2) that a likelihood of confusion exists between the source of the product—or, more specifically, between the trade dress of [plaintiff] and [defendant]. This two-part analysis determines whether [plaintiff]: (1) has a protective interest; and, (2) whether that interest is being infringed.

> \* \* \* \* \* \*

> [I]n order to establish that trade dress has acquired a secondary meaning, the plaintiff must show that the purchasing public associates goods designated by a mark with a *particular source.*"

(*Tripledge Prods., Inc. v. Whitney Resources, Ltd.,* 735 F.Supp. 1154, 1161–62 [E.D.N.Y.1990] [citations omitted; emphasis in the original]).

In the instant case, the Magistrate Judge found that EXCEDRIN PM's trade dress has acquired secondary meaning. The defendant McNeil takes strong exception to this finding and claims that none of the evidence presented by Bristol–Myers, "whether taken separately or as a whole meets the 'heavy burden of proof' required to show secondary meaning" (McNeil's Objections at p. 6, *citing 20th Century Wear, Inc. v. Sanmark–Stardust, Inc., supra,* 815 F.2d at p. 10).

Proving secondary meaning entails vigorous evidentiary requirements in accordance with the criteria established by the Second Circuit in *20th Century Wear, Inc. v. Sanmark–Stardust, Inc., supra,* 815 F.2d at p. 10 (*see also Coach Leatherware Co. v. Ann Taylor, Inc.,* 933 F.2d 162, 168–69 [2d Cir.1991]). In *20th Century,* it was sug-

gested that a plaintiff should attempt to offer evidence of consumer studies and successful advertising. Additionally, a finding that the defendant intentionally copied the plaintiff's mark "could also be persuasive, if not conclusive, evidence of consumer recognition and good will" (*id.*).

In sum, in order to establish that a trade dress has acquired secondary meaning, a plaintiff must show that the purchasing public associates goods designated by a mark with a *particular source* (*20th Century Wear, Inc. v. Sanmark–Stardust, Inc., supra*). As Judge Metzner stated, "[t]he crux of the secondary meaning doctrine is that the mark comes to identify not only the goods but the source of the goods" (*Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 133 [S.D.N.Y.1972]). In this regard, proof of sales success, advertising expenditures, unsolicited media coverage of the product, consumer surveys, intentional copying of the product, and length and exclusivity of the product in the market should be offered and are relevant factors for the Court to consider (*see 815 Tonawanda Street Corp. v. Fay's Drug Co.,* 842 F.2d 643, 648 [2d Cir.1988], *citing Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 [2d Cir. 1985]). The plaintiff need not establish all of the factors, and no one particular factor is dispositive; "the ultimate test is the success plaintiff achieves in popularizing its mark" (*Pan Am. World Airways, Inc. v. Panamerican School of Travel, Inc.,* 648 F.Supp. 1026, 1034 [S.D.N.Y.1986], *aff'd,* 810 F.2d 1160 [2d Cir.1986]).

The Second Circuit, in *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1132 [2d Cir.1979], provided an incisive summary of "secondary meaning" in this context:

> "Consideration of evidence of secondary meaning will almost always work in favor of the senior user. Its mark, if registered, is presumptively distinctive. *See Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 11. Proof of secondary meaning, acquired perhaps through successful advertising, can only enhance the strength of its mark and thus enlarge the scope of the

protection to which it is entitled. On the other hand, *the owner of a distinctive mark need not introduce evidence of secondary meaning in order to gain protection for its mark against the confusing similarity of others.* Thus, for example, the relatively small size of a user's advertising budget or sales volume will not diminish the strength of its valid mark, and the scope of protection accorded to that mark will not be narrowed because of such evidence. *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 [2d Cir.1978]. *Only if the junior user carries the burden of affirmatively demonstrating that a term is generic is the senior user stripped of protection. Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 9–10; 15 U.S.C. § 1064(c)" *(McGregor–Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1132) (emphasis supplied).

In terms of advertising expenditures, Bristol–Myers presented evidence that it has expended in excess of $81 million in advertising and promoting EXCEDRIN PM over the past twenty years, with $10 million in advertising in each of the last three years (PX 4; RR at p. 13; OA at p. 5).[4] In addition, sales of EXCEDRIN PM have exceeded $300 million, with $44 million in 1990 alone (PX 4; RR at p. 11; OA at p. 5). McNeil characterizes these amounts as "trivial for a national brand" (McNeil Objections at p. 7) and stresses the uneven budgetary allotments for EXCEDRIN PM advertising from the years 1979–1989 (*id.*; OA at p. 77).

In terms of public recognition of the product, the defendant asserts that Bristol–Myers is very familiar with how low consumer awareness is and cites Bristol–Myers' own research that only 2.4% of the fifty million nighttime analgesic purchasers are EXCEDRIN PM users (OA at p. 77; McNeil Objections at p. 8). The defendant relies upon a survey wherein a sample group of consumers was asked to identify all the pain relievers they could think of, without prompting, and only .8% mentioned

EXCEDRIN PM. McNeil contrasts this statistic with a 78% identification of TYLENOL without prompting (DX 29 at pp. 37–38). However, the defendant acknowledges that the recognition factor increased dramatically to 87.9% when consumers were asked in a Gallup poll if they had ever heard of EXCEDRIN PM—a result which McNeil explains as "probably due to the halo effect from parent Excedrin" (OA at p. 77; McNeil Objections at p. 8; DX 29, at p. 41). In this regard, the Court finds defendant's exhibit 18 particularly enlightening on the subject of sales and consumer recognition:

> "Excedrin PM [is] the only competitor ($25 MM 1989 factory sales, + 38% versus 1988). Notably, Excedrin PM represents a solid portion of the Excedrin franchise (14% of the Brand's unit share and 22% of dollar share)" (DX 18, 06539).

Having reviewed the evidence submitted by Bristol–Myers, the Court finds the testimony and documentary evidence sufficient to meet the standard articulated by the Second Circuit in *Thompson Medical Co. v. Pfizer, Inc., supra,* 753 F.2d at p. 217, with regard to advertising expenditures, consumer recognition and sales success (*see Thompson Medical* factors, *infra,* at p. 195).

One of the *Thompson Medical* factors which supports the finding of secondary meaning is the length and exclusivity of Bristol–Myers' use of the EXCEDRIN PM trade dress. From 1969 to 1990, Bristol–Myers has continuously and exclusively produced EXCEDRIN PM as an analgesic with a sleep aid and has been the only such product on the market. In addition, the Court finds that the survey evidence presented by Bristol–Myers (*infra,* Point IV[C][iv][5]), though problematic in terms of some of its methodology, does show evidence that EXCEDRIN PM has achieved secondary meaning in the marketplace.

The most persuasive *Thompson Medical* factor is the finding that McNeil has intentionally copied the EXCEDRIN PM trade

---

**4.** The notations "PX" and "DX" refer respectively to the exhibits of plaintiff and defendant; the number after each refers to the specific page of the exhibit.

dress (*see Centaur Communications v. Communications*, 830 F.2d 1217, 1224 [2d Cir.1987]; [*see also 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 [2d Cir.1987] [finding of intentional copying was persuasive, if not conclusive, evidence of consumer recognition and goodwill]). The evidence of imitative intent and intentional copying are discussed at length under the *Polaroid* factors (*infra,* Point IV[C][iv][6]).

Once the plaintiff has established that the trade dress—here the EXCEDRIN PM trademark and packaging carton—has acquired secondary meaning in the marketplace, the burden shifts to the defendant to show that the trade dress sought to be protected is "functional," and therefore is not covered under section 43(a) of the Lanham Act (*see LeSportsac, Inc. v. K Mart Corp., supra,* 754 F.2d at p. 76). A "functional" feature is one that "is essential to the use or purpose of an article or ... affects the cost or quality of the article" (*id.; see also Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 975 [2d Cir. 1987] [discussing "functionality" defense]).

Trade dress protection does not extend to a product's functionality—those characteristics of the product which are essential to its purpose or use (*see Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 171 [2d Cir.1991]; *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76 [2d Cir.1990]).

A design feature of an article is essential only if the feature is dictated by the function to be performed (*LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d at p. 76). When a product design is involved, the test for functionality is whether a consumer is likely to purchase the article because the design is aesthetically pleasing, or because it identifies the origin of the goods. If the product design causes the latter, the design is a legitimate trademark (*id.* at 78). The defendant in a trademark case has the burden of proving functionality (*id.* at 76). The Court has already found that the EXCEDRIN PM trade dress is arbitrary and distinctive, particularly because it identifies the origin of the goods. Based on

our review of the evidence, the Court adopts the Magistrate Judge's finding that McNeil did not meet its burden of proving that the trade dress of EXCEDRIN PM is functional.

Given the findings of intentional copying of the trade dress, its duration and exclusive use, and the relative significance of advertising expenditures, considered in the context of the relevant consumer groups, the Court finds, as did the Magistrate Judge, that the EXCEDRIN PM trade dress has achieved secondary meaning. Having determined that Bristol–Myers has a protectible property interest in the EXCEDRIN PM trade dress, the Court now considers the question of whether McNeil has infringed upon that right.

### iv. Trade Dress Infringement: "Likelihood of Confusion"

Even though the plaintiff has established secondary meaning as to the source and is not defeated by the functionality defense, the plaintiff must also substantiate the second prong of "likelihood of confusion," which is a demonstration of "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question" (*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 [2d Cir.1988], quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 [2d Cir.1978], *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 [1979]).

McNeil asserts that its trademark/brand name "TYLENOL" on the packaging is different from the trade name "EXCEDRIN" and that such a defense is sufficient to defeat a claim for infringement. The Court finds this argument to be McNeil's most potent defense. Given the recognition factor of the TYLENOL brand name, Bristol–Myers has a substantial burden to overcome in proving likelihood of confusion.

In assessing the likelihood of confusion, the Court *must* consider the 8 factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495

(2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Each specific finding of the Magistrate Judge is "subject to a clearly erroneous standard, but the ultimate determination of the likelihood of confusion is a legal issue subject to *de novo* [appellate] review" (*Hasbro, Inc. v. Lanard Toys, Ltd., supra*, at pp. 75–76, *citing Banff, Ltd., supra*, 841 F.2d at p. 490). The Court now turns to this critical *Polaroid* analysis.

### "The *Polaroid* Factors"

What are the *Polaroid* factors designed to test? As Judge Miner has noted, "[t]he factors serve as a useful guide through a difficult quagmire" (*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 [2d Cir.1986]). "The factors are designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue" (*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d at 495). Consequently, each factor is to be evaluated in the overall context of its impact on the essential question of likelihood of confusion. At the outset, however, the Court takes note of the fact that competing goods require less proof under the *Polaroid* factors than non-competitive items in establishing likelihood of confusion (*Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 492 [2d Cir.1988]; *see Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1008–09 [2d Cir.1983]).

### (1) *Strength of the Senior User's Mark:*

Strength of a mark has been defined as "its tendency to identify the goods sold under the mark as emanating from a particular ... source" (*McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 [2d Cir.1979]). The strength of a mark is normally measured by two factors: conceptual strength and commercial strength. In terms of conceptual strength, the Magistrate Judge determined that the EXCEDRIN PM trade dress fits into the "arbitrary and fanciful" category (RR at p. 19; *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at p. 7). Placement of the mark in this category accords it the highest degree of protection and indicates the potential of the mark from the time it was first introduced (*see Vibrant Sales Inc. v. New Body Boutique*, 652 F.2d 299, 304 [2d Cir.1981], *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982)).

As to commercial strength, the Magistrate Judge found that based on the evidence, EXCEDRIN PM

"has been marketed in substantially the same trade dress for over twenty years and sales ... have been extraordinarily successful. It has been the only analgesic sleep aid in the analgesic section of stores for a significant part of the last twenty years ... is the most well known of all OTC products using the 'PM' designator" (RR at pp. 20–21).

The commercial success of the EXCEDRIN PM name reinforces the strength of the mark (*see Plus Products v. Plus Discount Foods, Inc., supra*, 722 F.2d at p. 1005). As demonstrated by its sales success and advertising expenditures, EXCEDRIN PM is a highly profitable endeavor (*Charles of the Ritz Group Ltd. v. Quality King Distrib.*, 832 F.2d 1317, 1321 [2d Cir.1987]).

In evaluating the strength of a mark, the Second Circuit has also looked to whether there has been extensive third party use of the words, noting that widespread usage would weigh against a finding of a strong trade name (*see Doe Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581 [2d Cir.1991]). The only two OTC products using "PM" are "Pertussin All–Night PM" (a nighttime cough medicine; DX 43) and "Refresh PM" (a nighttime eye drop; DX 42). Neither of these are in the same product category as EXCEDRIN PM, and neither, the Magistrate Judge determined, are "well-known or have achieved their own secondary meaning" (RR at p. 21).

As indicated in the prior discussion on "secondary meaning," McNeil maintains that the EXCEDRIN PM package has no secondary meaning and is not a strong mark. Relying upon this Court's decision in *Tripledge Prods., Inc. v. Whitney Resources Ltd.*, 735 F.Supp. 1154, 1163 [E.D.N.Y.1990], McNeil argues that the

Court "expressly rejected a claim that substantial advertising expenditures can establish secondary meaning" (McNeil Objections at p. 10). The defendant mischaracterizes the holding in *Tripledge.* While the Court did find that the plaintiffs had failed to meet their burden of establishing that the purchasing public associated their ads with a particular source, the advertising and marketing expenditure was only one factor reviewed. In fact, the Court did find that the plaintiffs had satisfied some of the *Polaroid* factors sufficiently to establish "likelihood of confusion," the second prong of the test.

The Court also notes that the facts of *Tripledge* are distinguishable from the instant case. The plaintiff in *Tripledge,* as of the date of the suit, had not been able to obtain a registered trademark of its name. The heart of the case dealt with the "false advertising" provisions of the Lanham Act, and the allegedly infringing windshield wiper involved was a "knock-off" product. The trade dress at issue consisted of advertisements used by the plaintiff to market its product. The Court found that the plaintiff had not been an "exclusive marketer" of multi-edged wipers, "as there is evidence that other non-parties have entered the market and have been advertising their sale" (*id.,* at p. 1163). The contrast with the circumstances involving EXCEDRIN PM is self-evident, and the Court finds the defendant's reliance on *Tripledge* for proof of a lack of secondary meaning in the context of this case to be inappropriate.

The Court therefore holds that EXCEDRIN PM is a strong mark warranting protection under the trademark laws. This first *Polaroid* factor clearly favors Bristol–Myers.

### (2) *Degree of Similarity Between The Two Marks:*

In determining similarity, "it is the combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public" (*Harlequin Enters., Ltd. v. Gulf & Western Corp.,* 644 F.2d 946 [2d Cir.1981] ).

The Magistrate Judge examined the following elements of the trade dress of both EXCEDRIN PM and TYLENOL PM: (1) color patterns and shading of the caplet boxes versus the tablet boxes; (2) the pattern, size and fonts of the lettering on each box; (3) the placement, spacing, type size and appearance of the "PM" designator on each box, including the lack of periods between the letters "P" and "M"; (4) the layout and wording of the benefit lines on each box; (5) the colors of the caplets and tablets of each brand; (6) the imprint of the "PM" mark on the tablets and caplets of both brands; and (7) the depiction and placement of the caplets and tablets on each box. In doing so, the Magistrate Judge concluded that there was "sufficient similarity between the products to scrutinize the evidence for proof of confusion" (RR at p. 25).

Nowhere in its objections does the defendant McNeil challenge the Magistrate Judge's finding of "sufficient similarity" under this particular *Polaroid* factor, although it does contend throughout that the TYLENOL PM "box" is "designed to be consistent with the rest of the adult Tylenol line" (McNeil's Response to Bristol's Objections at p. 7; OA at p. 52). McNeil stresses that the TYLENOL name is the product's most prominent feature, and that the name is totally distinctive (*id.*). The Court finds this posture to be an oversimplification of the issue—although the TYLENOL name is a substantial factor, it is only one element of the trade dress which forms the basis of this suit. Assuming the quality and integrity of the TYLENOL family of products, McNeil nevertheless cannot use the TYLENOL brand name to shield itself from responsibility for the overall imitative trade dress of TYLENOL PM.

Bristol–Myers asserts that the Magistrate Judge's finding on this factor is incomplete, and, "while generally in Bristol's favor, is at best ambiguous ..." (Bristol's Objections at p. 20). Specifically, Bristol–Myers states that the Magistrate Judge "did not explicitly compare the packages *as a whole* and did not make any express

finding on the overall degree of similarity" (*id.* at p. 21).

The second *Polaroid* factor looks to whether the similarity of the marks is likely to provoke confusion among prospective purchasers (*Doe Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576 [2d Cir. 1991]; *McGregor–Doniger, Inc. v. Drizzle Inc., supra,* 599 F.2d at p. 1133). A court must examine the visual appearance of each mark in the context of its use (*see Jim Beam Brands Co. v. Beamish & Crawford Ltd.,* 937 F.2d 729, 734 [2d Cir.1991]; *Banff, Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486, 492 [2d Cir. 1988]). The test for determining similarity is whether the labels create the "same overall impression" when viewed separately (*Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.,* 680 F.2d 891, 893 [2d Cir. 1982], *quoting RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 [2d Cir. 1979]).

In looking to the overall context, the Court observes what is basically a four-line pattern on the trade dress of both EXCEDRIN PM and TYLENOL PM, running the eye from top to bottom of both boxes. The pattern consists of a modifying line ("aspirin free" EXCEDRIN PM; "extra strength" TYLENOL PM), a product name line (EXCEDRIN PM; TYLENOL PM), a benefit line, and finally a volume line (50 tablets; 24 tablets) with depiction of the product. The type face is similar as is the nearly identical style, size and font of the "PM" designator and the placement of the product picture. In light of the fact that these patterns are not dictated by function, and a variety of patterns are possible, the similarity of the patterns is striking. When this striking similarity is factored into the likelihood of confusion analysis, in light of the EXCEDRIN PM trademark strength, consumer confusion is a likely result (*see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., supra,* 799 F.2d at p. 873). The Court holds, therefore, that the packages of EXCEDRIN PM and TYLENOL PM create the "same overall impression" when viewed separately (*Paco Rabanne Parfums, S.A. v. Norco Enters., Inc., supra*).

Having assessed the similarity of the marks under the *Polaroid* standard, the Court finds that the marks are similar—the general impression conveyed to the public by these designations does not differ significantly, and the similarities create an issue of fact on the likelihood of consumer confusion. The Court therefore finds the second factor of "similarity" in Bristol-Myers' favor.

### (3) *Competitive Proximity of the Two Products:*

Where the two products are in direct competition with each other, the likelihood of confusion increases (*Lambda Elecs. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 926 [S.D.N.Y.1981]). In the instant case, the Magistrate Judge found that "the close proximity between the two products in the OTC analgesic section of supermarkets or drug stores favors a finding of likelihood of confusion" (RR at p. 26, *citing Charles of the Ritz Group v. Quality King Distrib.,* 832 F.2d 1317, 1322 [2d Cir.1987]).

McNeil objects to this conclusion, claiming that there is an absence of proximity between the products which weighs in McNeil's favor. During the hearing, the Magistrate Judge reviewed Bristol-Myers' photographic arrays of placement of EXCEDRIN PM and TYLENOL PM in drugstores and supermarkets in metropolitan New York and New Jersey, a "planogram" designed by McNeil for distribution to retailers encouraging the stocking of TYLENOL PM with the remaining Tylenol product line, and a videotape walk-through of the pharmaceutical area in a Pathmark store in Bayside, New York (Tr. 789–91).

McNeil emphasizes that while it agrees with the "authenticity of the photographs," it does not "stipulate that they were representative" (McNeil Objections at p. 22). According to McNeil, Bristol-Myers "offered no proof on that subject" and the "uncontradicted evidence is that Tylenol PM is typically shelved together with other Tylenol products and away from Excedrin PM products" (*id.,* at 23).

In terms of proximity, the concern is whether "it is likely that consumers 'mis-

takenly will assume either that [the junior user's goods] are associated with [the senior user] or are made by [the senior user]' " (*Charles of the Ritz Group v. Quality King Distrib., supra,* 832 F.2d at p. 1322, quoting *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co., supra,* 799 F.2d at p. 874).

Both the plaintiff and defendant are selling an OTC analgesic sleep aid, with almost identical ingredients. They distribute EXCEDRIN PM and TYLENOL PM directly to mass-market retail stores. Accordingly, the products can be found in the same stores and in the same merchandising sections. They are not "out of reach"—they do not have to be asked for by name. Given this proximity, differences in methods of display do not eliminate "the likelihood that customers may be confused as to the source of the products, rather than as to the products themselves" (*McGregor–Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at p. 1134).

The Court examined the documentary evidence submitted by the plaintiff, namely, the photographic array noted above (*see* PX 33). Contrary to McNeil's assertion that the products "are shelved apart from each other in 27 out of 32 legible photographs," the Court finds that in twelve of approximately twenty-eight photographs reviewed, the packages of EXCEDRIN PM and TYLENOL PM are in close proximity; in three of the photographs, the packages are directly adjacent.[5] Although the defendant was unwilling to stipulate that these photographs are "representative," the Court finds them probative on the issue of control over the placement of the two products in retail markets. Despite McNeil's assertions that it provides a planogram to each of its retailers—a claim which the Court readily finds credible—it has little if any ability to control and monitor the placement of TYLENOL PM on a daily basis. The Court adopts the Magistrate Judge's finding that this close proximity between the products favors likelihood of confusion (RR at p. 26).

Clearly, the plaintiff and defendant are direct product competitors. The Court finds that the two products are in competitive proximity, and that such competition is not significantly reduced by McNeil's efforts to provide planograms to retailers. Consequently, the Court finds in Bristol–Myers' behalf with regard to the "competitive proximity" factor.

#### (4) *Likelihood Plaintiff Will "Bridge the Gap":*

This factor is normally addressed when the products being reviewed are not in direct competition with each other, and the question arises "is the plaintiff likely to enter this market?" Here, there is direction competition between EXCEDRIN PM and TYLENOL PM, eliminating the need to consider this factor.

#### (5) *Evidence of Actual Confusion:*

▮ "Evidence of actual confusion is a strong indication that there is a likelihood of confusion" (*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1198 [E.D.N.Y.1983]). It is not, however, a prerequisite for the plaintiff to recover, since proof of actual confusion is almost impossible to obtain (*McGregor–Doniger, Inc., supra,* 599 F.2d at p. 1136).

Surveys are often introduced in this context to show likelihood of confusion. A court may place such weight on survey evidence as it deems appropriate (*Weight Watchers Intern., Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1272 [S.D.N.Y.1990]). To support its argument, Bristol–Myers introduced two marketing surveys: an "identification" survey and a "permission" survey.

The identification survey completed by Dr. Robert Sorensen, the plaintiff's expert in trademark litigation survey research, was designed to measure the degree of confusion present among "low-involvement" consumers (the "low-involvement" theory is subsequently discussed under "Sophistication of Purchasers," *infra,*

---

**5.** The three photographs form part of PX 33: CVS Store, Valley Road, Upper Montclair, New Jersey; Folk Drug & Home Care, 259 E. 72nd Street, New York, New York; Pathmark Store, 92–10 Atlantic Avenue, Queens, New York.

Point VI[C][iv][8] ). Each respondent was presented with masked and unmasked pairs of EXCEDRIN PM, TYLENOL PM and PANADOL. The overall misidentification of TYLENOL PM for EXCEDRIN PM amounted to 23.9%; however, the Magistrate Judge found the significance of this figure to be decreased based on certain "non-fatal" flaws. The Magistrate Judge also credited the specific findings of other courts which have criticized "masking" as a method of determining likelihood of confusion (RR at p. 56).

Although the Magistrate Judge characterized Dr. Schwartz, the defendant's expert, as the epitome of a "hired gun" (RR at p. 52, n. 21), he nonetheless credited Dr. Schwartz's criticism of the universe chosen in the identification survey. The Magistrate Judge stated:

"[t]he universe chosen fatally undermines Dr. Sorensen's attempt to 'simulate a marketplace situation in which people will frequently reach for a package, not reading in a proactive sense ... not paying that much attention to the brand name itself.' (Tr. 538). Accordingly, the need for masking the brand name is obviated" (RR at p. 60).

Bristol–Myers objects to the Magistrate Judge's findings that the survey universe should have been limited to only actual, prior purchasers of EXCEDRIN PM.

Bristol–Myers also introduced the results of a "permission survey" in which respondents were presented with unmasked pairs of EXCEDRIN PM and TYLENOL PM boxes and asked the following question: "[w]hen looking at these packages, do you believe that either of these brands did or did not give permission to the other brand to use the letters PM, or the package colors, or the appearance of the package, or do you have no opinion?" (RR at p. 62). A second set of respondents was asked the same question, but with respect to boxes of TYLENOL PM and PANADOL. The results show that of the "21.4% of all respondents who expressed 'confusion' about the *giver* of permission, 53.8% of the respondents stated that EXCEDRIN or EXCEDRIN PM *gave* permission and 15.4% of

them named TYLENOL as the *giver* of permission" (RR at p. 63).

Although Dr. Schwartz found the permission survey to be fatally flawed by virtue of the initial question, the Magistrate Judge determined that the inquiry was acceptable. However, the Magistrate Judge raised the broader question of whether a "permission" survey tests confusion among the respondents or is merely a measure of the popularity or recognition of a product (RR at p. 65). The Magistrate Judge concluded:

"[b]ased on the above responses and the structure of the 'permission' question, the court concludes that this survey is inappropriate to test confusion as to association or sponsorship when the 'permission' comparison involves an established product and a new product which compete in the marketplace.... Accordingly ... I give little weight to the 'permission' survey in determining whether there is confusion as a result of association or sponsorship" (RR at pp. 66, 68–69).

Bristol–Myers claims that the Magistrate Judge "thus summarily dismissed the many cases in which courts have embraced a permission or association survey involving an established product and a relatively new one, including the Mutual of Omaha case, which, only two pages earlier, the Magistrate offered as a properly conducted permission survey" (Bristol–Myers Objections at p. 27). Bristol also objects to the Magistrate Judge's rejection of the ASI test (consumers who viewed TV ads one day and were tested for recall the next), and the evidence offered concerning the confusion of McNeil's own salespersons.

McNeil objects to the Magistrate Judge's reliance on these two surveys to find secondary meaning, contending that the surveys were designed to show likelihood of confusion. McNeil asserts that such misplaced reliance rendered the surveys useless because they were not probative of the relevant issues.

On review of the record below, the exhibits presented by both parties, the Report and Recommendation of the Magis-

trate Judge and the issues raised at oral argument, the Court finds that the Sorensen study did not limit the universe to consumers who had purchased an OTC analgesic with a sleep aid as it should have. Therefore, some of the respondents may not have been in the market for an analgesic of any kind, and the study universe was therefore overly broad (*see Weight Watchers Intern., Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1272 [S.D.N.Y.1990]).

Flaws in a study's universe can seriously undermine the probative value of the study, because to "be probative and meaningful ... surveys ... must rely upon responses by potential consumers of the products in question" (*Universal City Studios v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 [2d Cir.1984], *quoting Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108, 1116 [S.D.N.Y.1981]). Those who are not potential consumers "may well be less likely to be aware of and to make relevant distinctions when reading ads than those who are potential consumers. The ability to make relevant distinctions is crucial when what is being tested is likelihood of confusion" (*Weight Watchers Intern., Inc. v. Stouffer Corp., supra*, at p. 1273).

■ Although the results of both the identification and permission surveys demonstrate a degree of actual confusion, the flaws in methodology lead the Court to accord only a modicum of weight to those results. The Court further notes that even "accurate and probative market research does not conclusively decide the issue of likelihood of confusion in Lanham Act cases" (*see McDonald's Corp. v. McBagel's Inc.*, 649 F.Supp. 1268, 1278 [S.D.N.Y. 1986]).

The Court remains cognizant of the fact that Bristol–Myers was not required to introduce *any* survey evidence, and that this is but one of the eight factors under consideration. These results, therefore, do not affect the Court's overall determination of likelihood of confusion. Consequently, the Court holds that this "evidence of actual confusion" *Polaroid* factor neither helps nor hinders Bristol–Myers' case.

**(6)** *Junior User's Good Faith:*

■ The Court turns now to what is perhaps the most critical area of consideration in this action for trademark infringement. The junior user's state of mind— i.e., whether he was aware of the plaintiff's mark when adopting his own—is relevant in determining likelihood of confusion as well as in balancing the equities (*Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1227–28 [2d Cir.1987]; *Tripledge Products, Inc. v. Whitney Resources, Ltd., supra*, 735 F.Supp. at p. 1162).

In reviewing the exhibits, depositions, and testimony of the fact and expert witnesses on both sides, the Magistrate Judge characterized certain aspects of McNeil's conduct as "disturbing" (RR at p. 48), even though he concluded that "the totality of such evidence does not warrant a finding of intentional copying" (RR at p. 48). The Court respectfully disagrees with this conclusion. For the reasons set forth below, the Court finds that Bristol–Myers established sufficient evidence of intentional copying on the part of McNeil.

This "good faith" factor "looks to whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between his and the senior user's product" (*Edison Brothers Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 [S.D.N.Y. 1987], *quoted in Doe Lang v. Retirement Living Publishing Co., Inc., supra*, 949 F.2d at 581). The question of whether McNeil acted in bad faith in adopting its TYLENOL PM mark and trade dress involves hotly contested facts concerning the process utilized by McNeil before it introduced the current TYLENOL PM packaging (*see Hasbro Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 [2d Cir.1988]). There is no doubt that McNeil was aware of the EXCEDRIN PM mark and trade dress when it implemented its plan to enter the "analgesic-with-sleep-aid" market. McNeil has admitted that EXCEDRIN PM is the leading seller nationally in this category (Answer, ¶ 7). As a potential meaningful competitor to the national leader, it was

well aware of the EXCEDRIN PM trade dress.

From its inception in 1969 and up until early 1991, EXCEDRIN PM was the only OTC analgesic product containing a sleeping aid as a second ingredient (PX 1, M07527; PX 7, P003825–36). The trade dress of EXCEDRIN PM, in its blue package, was visually distinct in the analgesic section of retail stores for twenty years prior to the introduction of TYLENOL PM; the green caplet box existed for several years prior to the marketing of TYLENOL PM (RR at pp. 20, 41; PX 21). Traditionally, TYLENOL products, and in particular the analgesic items, have been marketed in a trade dress consisting of three predominant colors: red, yellow and white, with intermittent type face in black (DX 307; Bristol–Myers Objections, Ex. B). McNeil abandoned this "family-of-products" color scheme when it introduced TYLENOL PM in 1991.

 In this regard, the Magistrate Judge determined that Bristol–Myers established several key facts: that McNeil had a blue EXCEDRIN PM box in its meeting room when the staff discussed TYLENOL PM's proposed trade dress; that McNeil surveyed EXCEDRIN PM customers in order to develop a marketing strategy for TYLENOL PM; and that McNeil personnel discussed the similarity of certain elements between EXCEDRIN PM and TYLENOL PM. In further concluding that Bristol–Myers had nonetheless fallen short of proving intentional copying, the Magistrate Judge interpreted the Second Circuit's posture in such cases as requiring a "heightened degree of proof" sufficient to warrant the issuance of a preliminary injunction. The Court declines to adopt this interpretation.

Bristol–Myers objects to the Magistrate Judge's finding in this regard and claims that the standard ascribed to the Second Circuit is erroneous. After reviewing the cases relied upon by the Magistrate Judge (RR at p. 36), the Court concurs with the plaintiff that the determination of the *Polaroid* factors in those cases, specifically on the issue of intentional copying, does not mandate a "heightened degree of proof" (Bristol–Myers Objections at pp. 4, 22).[6]

As part of its *de novo* review, the Court has carefully compared the packages at issue and, while this kind of determination is admittedly subjective, the Court is of the opinion that they seek to project the same look. Taking the trade dress of each as a whole, the Court is convinced that a customer who is familiar with the EXCEDRIN PM package, upon seeing one of the new TYLENOL PM packages alone, could easily confuse it with the EXCEDRIN PM. In virtually every detail, the TYLENOL PM box is substantially similar to the EXCEDRIN PM box, except for the respective names.

The Court questions the lack of McNeil documents related to the packaging and design decisions in the creation of TYLENOL PM (RR at pp. 36–37). The testimony of James Lenehan, former vice-president of marketing at McNeil, concerning the research and development of TYLENOL PM marketing strategies is less than credible. The Magistrate Judge stated that the court had to infer what management decisions occurred during the creation of TYLENOL PM because of the lack of documentary evidence, noting, however, that Bristol–Myers had been unable to show intentional destruction of documents by McNeil (RR at p. 37).

 Lenehan acknowledged that the target audience for TYLENOL PM in the Fall of 1990 was EXCEDRIN PM users (Tr. 2088). This fact is corroborated by information in McNeil's TYLENOL PM launch book which states that McNeil expected "45% of TYLENOL PM sales volume" to be "incremental to the TYLENOL base business," with "*18% sourced from EXCEDRIN*" (emphasis supplied). The Court finds it significant that Lenehan testified to the existence of only six doc-

---

**6.** The Court further notes that a preliminary injunction was granted in the three cases cited by the Magistrate Judge.

uments in the original file on the TYLE-NOL PM project—one of which was a congratulatory note which Lenehan conceded was not very important in the overall scheme of the TYLENOL PM launch (Tr. 2091-2097). The Court notes the following exchange:

"Q Are those documents in Plaintiff's Exhibit 84, the only documents that you ever received concerning the TYLENOL PM project as it was ongoing?

A No. I get all kinds of documents that I don't hold. I get lots of mail.

Q What do you do with what you don't hold? Do you throw it out?

A I get a pile of mail everyday and I throw it out.

 * * * * * *

Q Okay. And every other document besides the six that you testified about, you threw out every other TYLENOL PM related document? ...

A Yes, and on other projects as well. I don't keep a lot of paper.

Q When did you throw them out?

A As I get them" (Tr. 2091-92, 2097). This lack of a so-called "paper trail" initially could lead to an inference of bad faith. The situation was compounded by the testimony of McNeil's President, Chandler Simonds, Jr., who stated that it was the normal practice of McNeil's management to take notes of advertising and design meetings (Tr. 94), although no such notes were produced. Illuminating in this regard is the following testimony of Donald M. Casey, the products director for McNeil's Adult Tylenol line:

"A We reviewed packaging probably on 20 different occasions with different levels of people ...

Q And there is not a single note, not a single minute of anything that happened in any of these meeins; [sic] is that right?

A That's correct" (Tr. 75-76). The Court finds this testimony unworthy of belief.

McNeil sought to overcome this inference of bad faith by pressing its persistent claim that the overall image of the TYLE-NOL PM trade dress was a natural extension of the adult Tylenol analgesic line (RR at p. 37; McNeil Objections at p. 2; OA at p. 52-53). According to McNeil's product manager, its package designer, Gerstman & Meyers was directed to make the TYLE-NOL PM trade dress consistent with the adult Tylenol line which they had redesigned (Tr. 69).

However, in his testimony, Casey acknowledged that on all other Tylenol products, only the trademark name "TYLE-NOL" appears on a single line (Tr. 67). When pressed by Bristol–Myers' counsel, Casey added the following comments:

"Q Can you tell me why this is the first time that the mark [TYLENOL] has been ... altered, added to. To include anything but the simple word Tylenol? ...

A When we were developing the Tylenol PM packaging we wanted to keep the redesign elements which we had just spent a million dollars on consistent, which necessitated us putting the PM on the same line ...

Q Mr. Casey, do you recall Mr. Perkins and Mr. Simonds saying they wanted the PM on a separate line so as not to clutter the line that says Tylenol all by itself?

A Yes. Originally when we were developing that packaging, they expressed that they would like to see options with the Tylenol PM in a variety of places. And when we developed the packaging we decided we would look at [a] number of options. We did...." (Tr. 68-69). Having reviewed the testimony, examined the exhibits and heard oral argument, the Court discounts such testimony. Examining the Tylenol "family of product" look as espoused by McNeil, the Court observes that twenty-nine of the thirty-one products displayed show only the "Tylenol" brand name on a single line—with only two exceptions, namely the boxes containing TYLE-NOL PM tablets and caplets. (For example, the Court observes "Extra–Strength" TYLENOL [with modifier "Extra–Strength" above the Tylenol name]; TYLE-NOL "Allergy Sinus" [with "allergy sinus" qualifier below the Tylenol name]; "Junior Strength" TYLENOL [with modifier above

the TYLENOL name]; TYLENOL "Cold & Flu" [with qualifier on two lines below the TYLENOL name]). These are only four of the thirty-one products displayed (DX 307; Bristol–Myers Objections, Ex. B).

McNeil's strongest defense is its claim that the trademark name "TYLENOL" is different from the trademark name "EXCEDRIN" and that this factor is sufficient to defeat a claim of infringement. However, the Court notes that this suit is based on a claim of trade *dress* infringement and courts have granted preliminary injunctions for such infringement despite the difference in well-known brand names reflected on the products (*see Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.,* 281 F.2d 755 [2d Cir.1960]; *Miles Shoes, Inc. v. R.H. Macy & Co.,* 199 F.2d 602, 603 [2d Cir.1952]; *Kraft General Foods, Inc. v. Friendship Dairies,* 19 U.S.P.Q.2d 1691, 1991 WL 149755 [S.D.N.Y. June 26, 1991] [Conboy, J.]).

The Court finds the color scheme of TYLENOL PM's trade dress to be a major departure from the traditional red, white and yellow schematic of the Tylenol analgesic line (DX 307). James Lenehan testified that McNeil chose blue as a result of the Cheskin color study on pill form conducted in 1983. However, the contemporaneous notes of McNeil's own package designer, Gerstman & Meyers, show that in August 1989, Carol Kahrs (product director for Tylenol) told the design firm that the color of the TYLENOL PM pill "will be light blue like EXCEDRIN PM" (PX 1, M11495).

A review of the approximately sixty separate package mockups reveals that multiple options were presented to McNeil in terms of color and design. The Court finds a number of these mockups particularly enlightening. For example, DX 413 shows a color gradation from royal blue to medium blue at the bottom, with the TYLENOL name appearing by itself. Above the trade name is the modifier "Nighttime," while below it is benefit copy reading "Extra Strength Pain relief that helps you sleep." DX 411 reveals a gray box front with multiple blue hues forming a bar across the midsection. The brand name TYLENOL appears by itself across the top one-third of the panel, with the letters "PM" centered below on the blue bar. Deposition Exhibit Waxman 9–0 again shows a gradation of color from medium to lighter blue, with the TYLENOL brand name on a single line and the designation "P.M." directly under it (alternative abbreviation of the usual "PM"), and a benefit line reading "Pain reliever that helps you sleep." In Deposition Exhibit Waxman 7C, the package designers tried a shaded blue background moving from lighter to darker blue, with accompanying stars, similar to McNeil's "TYLENOL COLD Night–Time" package. Here, the TYLENOL name again appears by itself, with the "PM" designator in yellow on the line below. For some unknown reason, McNeil rejected all these possible designs, along with many others which would have moved its final product much further along the spectrum away from the EXCEDRIN PM trade dress.[7]

Based on this evidence, the Court finds that McNeil had every opportunity, not to mention resources, to exercise good faith in selecting a trade dress that truly reflected the adult Tylenol line. Instead, every choice it made brought it closer to the EXCEDRIN PM trade dress. This is not a case where designers and manufacturers had no options. Rather, McNeil consciously chose to assemble the elements of the EXCEDRIN PM trade dress, a fact corroborated by the following startling admission of Donald Casey, the product manager:

"Q After you get by the mark could you pick out the package from exhibits 6, 7, 8 and 9 which look the most like this one? This one being Excedrin PM....

A 8B.

Q 8B. Okay. Let me now ask you the question in kind of a reverse. Looking at the Tylenol PM package, blue package, would you agree that it has some similarity to the Excedrin PM package?

A Yes....

Q Is there any package you see on here which has a greater similarity to Exced-

---

7. See DX 406, 401, 404, 422, Deposition Exhibit Waxman 6D, PX 6–9.

rin PM than the Tylenol PM package you marketed....

A No really.

Q So if I'm understanding you then you spent about four hundred thousand dollars to have Gerstman & Meyers create about 60 or 70 of these package markups, right?

A Yes.

Q And in the end what you brought to market was the one package markup that looked—that had the greatest similarity to Excedrin PM, right?

A As we phrased it, yes" (Tr. 89–90). When pressed by counsel on cross-examination, this same conclusion was reached by McNeil's packaging expert, Dr. Schwartz (Tr. 1750).

The Court accepts the defendant's contention that blue is an appropriate color for a nighttime product. However, the Court does note that the packages of other products sold specifically as sleep aids (DX 51) do not reflect the color blue, with the exception of NYTOL's blue-green background. The remaining health aids sold as nighttime products have a blue background (DX 301). None of the products depicted in these exhibits, however, are analgesics, with the exception of EXCEDRIN PM and TYLENOL PM.

Of interest to the Court are TYLENOL's two nighttime products which have been in the marketplace for some time—"Pedia Care Night Rest" (cough suppressant) and "TYLENOL COLD Night Time" (multisymptom cold reliever) (DX 301). A pattern of stars emanates from the blue backgrounds of both packages. In addition, night administration of the medication is denoted by the terms "Night Rest" and "Night Time." McNeil abandoned both of these elements in the TYLENOL PM trade dress, despite its assertions of a desire to maintain consistency with other Tylenol products and the "family of Tylenol" look.

McNeil objects to the Magistrate Judge's conclusion that "blue-green is not a nighttime color that complements blue" (McNeil Objections at p. 21). The Court adopts the Magistrate Judge's finding that McNeil's

claims in this regard are not supported by the existing evidence (RR at p. 41).

The Court finds further supporting evidence of a lack of distinctiveness in the competing products in the following testimony of Arthur Congdon, McNeil's packaging expert:

"Q But in your view if you used an aqua you have a view that consumers would not be able to distinguish this package with that in the aqua?

A It depends on which one they choose. We are getting into a situation like this that we have to look at the colors to see what they do. It is difficult for me in isolation to make a judgment of a color with a number in a book.

Q Therefore, I would assume that you would agree with me that consumers would have difficulty in distinguishing the greens on these two packages?

A *I believe that the consumers might see both of those packages as being basically green.*

Q Thank you.

MR. ROSEN: Let the record reflect the two packages I was holding was [sic] Tylenol PM and Excedrin PM" (Tr. 1731–32) (emphasis supplied).

McNeil also maintains that it considered two names for its product: Extra–Strength Tylenol Nighttime and Extra–Strength Tylenol PM. It then purportedly conducted consumer testing of both names. The Court finds this argument to be disingenuous. Although McNeil may have conducted such consumer preference testing, it had virtually adopted the TYLENOL PM name by July, 1989—a full three months before the reported testing. McNeil continued to refer to the product as TYLENOL PM from July, 1989. This fact was supported by the Casey testimony (Tr. 84–85) as well as the admission by Brian Perkins that he, Mr. Vernon and Ms. Kahrs selected the name TYLENOL PM sometime in 1989 but before the basic II group focus test (Perkins Dep. 58).

With regard to the selection of "PM" to designate nighttime use, McNeil maintains that it reached this decision as the result of a focus group study of sixteen respon-

dents. Based on evidence previously discussed concerning mockups and concept boards presented to McNeil's executives months before the focus group study (and clearly geared to the TYLENOL PM logo), the Court finds that Lenehan's testimony on this subject is not credible. No one disputes the brevity of "PM" as a designator. However, the selection process used here, the directive to the package designers, and the specific placement of the designator on the line with the brand name raise a strong inference of imitative intent.

In addition, despite producing two earlier nighttime products, Pedia Care and Tylenol Cold, McNeil had never used "PM" prior to the trade dress of TYLENOL PM. In that sense, its nighttime products were consistent with the vast majority of other nighttime products. However, in this instance, McNeil insists that "PM" instantly relates "nighttime" to the consumer and is "routinely used by nighttime products" (McNeil's Post–Hearing Brief at p. 2). A review of the defendant's own exhibit belies such a claim.[8]

The Court also finds questionable the evidence in support of the placement of the "PM" designator on the same line with the Tylenol name. The testimony revealed that McNeil's senior management was having difficulty with the concept as well, as is evident in their recommendations to move the PM indicator to another line on the package (Perkins Dep. 129; Simonds Dep. 76, 92).

With regard to the benefit line of TYLENOL PM, the Court rejects McNeil's explanation that it simply adopted the language of a 1982 F.D.A. letter concerning labeling for a combination product. In the multitude of packaging mockups reviewed earlier by the Court, the proposed benefit line reads either "extra strength pain relief that helps you sleep" (i.e., DX 413) or "pain reliever that helps you sleep" (i.e., Deposition Exhibit Waxman 9–0). Subsequent mockups show a change to "For Pain With

Sleeplessness," closely approximating EXCEDRIN PM's "For Pain With Accompanying Sleeplessness."

The Court finds evidence of intentional copying of the benefit line revealed in documents such as a Gerstman & Meyers "Client Change Memo" in which, under the "billing description," item number 6 states "Benefit copy: For pain with accompanying sleeplessness (from Excedrin PM)" (Deposition Ex. Waxman 28A) (emphasis supplied). Adrienne Minecci, a member of the management team who worked for Donald Casey, took notes during a meeting of the "C–82 Team" which reveal the following:

(1) "C–42 Packaging: 2 facings? 1 TY, 1 EX PM; JTL >> Bases w/ L PM separated, no stars, Excedrin PM benefit " (PX 2, 00018);

(2) "Next Steps: Package w/ lines: ... Larger benefit copy, as on Excedrin PM ... Package w/o lines: ... Larger benefit copy, as in Excedrin PM ... Excedrin PM benefit copy: FOR PAIN WITH ACCOMPANYING SLEEPLESSNESS" (PX 18–3) (emphasis supplied).

Lastly, a February, 1990 internal memorandum of Gerstman & Meyers shows that the benefit line "FOR PAIN WITH ACCOMPANYING SLEEPLESSNESS" was taken from a photostat of an EXCEDRIN PM box attached to that memorandum (PX 17–3).

The Court also find its significant that McNeil received information concerning similarity and confusion between the trade dress of TYLENOL PM and EXCEDRIN PM in response to a TV commercial during its product launch in Atlanta. File notes indicate the following:

"# 8 Linda Smith ... Ad reminds her of Excedrin PM ... 2d Viewing? Would try it ... Nighttime pain reliever with an additive to relax you. Reminds of Excedrin PM" (PX 2, 00789).

---

8. DX 301 shows the following array of nighttime products: Pathmark "Nite Time Colds Medicine"; Vicks Nyquil "Nightime Colds Medicine"; Benadryl plus "Nighttime"; Duane Reade "Nite–Time Colds medicine"; Barre "Nite-Time"; Rite–Aid "Nite–Time"; Woolworth "Night Time"; Nytol; Bufferin AF "Nite Time"; Quiet World "Nighttime Pain Formula"; Compoz "Nighttime"; Sleepeze "Nighttime Sleep Aid."

Other feedback from the launch includes questions raised by McNeil's own representatives:

"7. The packaging on Tylenol PM is very similar to Excedrin PM; was this taken into consideration?

[A.] Tylenol PM packaging was designed to coincide with the introduction of new packaging on the entire Tylenol PM line. As a line extension it was felt that the packaging graphics should be similar. *Any similarity of Excedrin PM is unintentional*" (PX 13–4) (emphasis supplied).

The Court concurs with the Magistrate Judge's finding that Bristol–Myers did establish that McNeil had a blue EXCEDRIN PM box in their conference room when discussing TYLENOL PM's trade dress (RR at p. 36). The Court finds further evidence of such imitative intent in the testimony of Donald Casey that no other *analgesic* brands were displayed in the room, although there was an array of sleeping aids (Casey Dep. 385).

The Court further finds the testimony of Adrienne Minecci to be at odds with the single set of notes available from the Tylenol launch meetings. Ms. Minecci testified that she could not recall being at a meeting where "Excedrin P.M. would have been mentioned specifically in ... discussing product aesthetics" (Minecci Dep. 54). However, PX 18–3 clearly demonstrates that Ms. Minecci was present at a meeting of the launch team on January 29, 1990. In the four pages of notes discussing the product aesthetics of TYLENOL PM, EXCEDRIN PM is mentioned in comparative terms nine times. No other product name is mentioned in those notes.

McNeil's own management was very aware of the similarities between its proposed product and EXCEDRIN PM. In addition to all of the testimony and exhibits presented in the hearing before the Magistrate Judge, this issue was also addressed at oral argument (OA at pp. 33, 40, 57–60). In addition to the hearing testimony, the Court finds two documents to be convincing evidence of McNeil's own concerns regarding the similarity to the Bristol–Myers'

product. First, a memorandum from Brian Perkins to Carol Kahrs reveals the concerns of McNeil's president, Chandler Simonds:

"At today's Clinical Review meeting with CDS [Chan Simonds], he *again expressed his displeasure with the product aesthetics of TYLENOL PM being the same as EXCEDRIN PM.* Could you please put several samples with white printing up on stability—or some other color that differentiates TYLENOL PM. *In net, let's view our current product as our first shot and plan to evolve a better looking, more distinct product*" (PX 02215).

Above the memorandum is a hand-written note, ostensibly from Carole Kahrs to a staff member "AMM" stating "Please talk to Maili and make some alternatives."

A second memorandum reveals a continuing concern about the similarities on October 5, 1990. In plaintiff's exhibit MP 2, Brian Perkins wrote to Donald Casey stating, "DMC: Are we on solid legal ground with TYLENOL PM versus Excedrin PM trademark? BDP." The Court finds these documents to be striking and convincing evidence of McNeil's awareness that there were problems with the likenesses of these two products.

Bristol–Myers acknowledges that it has no monopoly, but it contends, and the Court agrees, that "the multiplicity of the similarities is objective evidence of defendant's conscious imitation of plaintiff's product" (*Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.,* 281 F.2d 755, 759 [2d Cir.1960]). The Second Circuit has noted that

"[i]n this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer" (*Harold F. Ritchie Inc. v. Chesebrough–Pond's, Inc.,* 281 F.2d 755, 758 [2d Cir.1960] [citations omitted]).

The defendant emphasizes that the "second comer" doctrine is no longer the controlling legal standard in trade dress in-

fringement cases based on the Second Circuit's holding in *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208 (2d Cir. 1985). The "second comer" principle was succinctly summarized in an interesting opinion of Judge Learned Hand where he quotes a prior opinion of Judge Augustus Hand:

> " 'Why it [defendant] should have chosen a mark that had long been employed by [plaintiff] and had become known to the trade instead of adopting some other means to identify [their] goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [plaintiff] had built up.' Indeed, it is generally true that, as soon as we see that a second comer in a mark has, for no reason that he can assign, plagiarized the 'make-up' of an earlier comer, we need no more.... [W]e feel bound to compel him to exercise his ingenuity in quarters further afield" (*American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 562–63 [2d Cir.1953], *quoting Miles Shoes Inc. v. R.H. Macy and Co.*, 199 F.2d 602, 603 [2d Cir. 1952] ).

In *Thompson Medical,* the Second Circuit reiterated that a senior user in possession of a distinctive mark has a right not to have a second comer intentionally cause a likelihood of confusion between two marks in an attempt to exploit the reputation of the senior user's mark (*Thompson Medical, supra,* 753 F.2d at p. 214; *see Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127, 1135 [2d Cir.1982] ). Noting that the two elements necessary to trigger the second-comer doctrine—a strong mark and bad intent—are already included in the *Polaroid* analysis, the Second Circuit stated that courts purporting to apply the second-comer "test" should "recognize that they are merely emphasizing two of the *Polaroid* factors" (*Thompson Medical* at p. 215). The Court therefore has focused upon the element of intent under the "good faith of the junior user" *Polaroid* factor.

■ The registrant of a mark is presumptively entitled to protection from a newcomer's use of a similar mark in direct competition, "particularly when no reasonable explanation is offered to show the second comer's need to come so close to the mark" (*Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563 [2d Cir.1982], *quoting American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2nd Cir.1978)).

The evidence is clear that McNeil's purpose was to trade on the EXCEDRIN PM mark with full knowledge that the TYLENOL PM mark would result in confusion. Although "actual and constructive notice of another company's prior registration" of a mark is not "necessarily indicative of bad faith," such knowledge *may* signal bad faith (*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2nd Cir.1987); *see Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1227 [2d Cir.1987] ). McNeil did not innocently select its potentially confusing mark and trade dress.

■ Once the plaintiff has introduced evidence which, taken cumulatively, allows an inference of intentional copying, the burden of proof on the element of good faith is on the defendant. Where the defendant began to use its mark after the plaintiff's trade mark registration, the defendant must carry the burden of explanation and persuasion (*Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097 [2d Cir.1969] ). McNeil has not sustained that burden.

The Second Circuit has held that evidence of intentional copying raises a presumption that the "second comer intended to create a confusing similarity" (*Charles of the Ritz Group v. Quality King Distrib.*, 832 F.2d 1317, 1322 [2d Cir.1987], *citing Mobil Oil Corp. v. Pegasus Petroleum Corp., supra,* 818 F.2d at 258; *Perfect Fit Industries v. Acme Quilting Co.*, 618 F.2d 950, 954 [2d Cir.1980] [citations omitted] ). Although this factor alone is not dispositive, it bolsters a finding of consumer confusion (*Charles of the Ritz Group v. Quality King Distrib., supra,* at p. 1322; *Centaur Communications, Ltd. v. A/S/M Communications, Inc., supra,* 830 F.2d at p. 1227).

The Court finds the above evidence to be compelling on the issue of intentional copying. An analysis of the logotype, graphic devices and color configuration of the EXCEDRIN PM and TYLENOL PM packages leads to the inescapable conclusion that the defendant intentionally copied Bristol–Myers' analgesic-with-sleep-aid trade dress (*see Kraft General Foods, Inc. v. Friendship Dairies, Inc., supra*, 1991 WL 149755 [S.D.N.Y. June 26, 1991] [Conboy, J.]).

Where we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark (2 J. McCarthy, *Trademarks and Unfair Competition*, § 23:33 at 148 [2d ed. 1984]). The Court finds another Eastern District case instructive on this point:

"On the assumption that a businessman will ordinarily act to his commercial advantage, and that the attraction of an established business' good will to the newcomer's product is such an advantage, the inference to be drawn from imitation is the imitator's own expectation of confusion as to the source of origin of his product. Where, as here, there is little to distinguish the marks themselves and the prior mark is a long-established one of which the newcomer was aware, doubts about intent are resolved against the newcomer, and a reasonable explanation of its choice is essential to establish lack of intent to deceive" (*E.I. duPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F.Supp. 502, 514 [E.D.N.Y.1975], *quoted in Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189 [E.D.N.Y.1983]).

The Court finds McNeil's proffer to be less than a candid and reasonable explanation of its choice of a trade dress that so closely approximates that of EXCEDRIN PM. In light of the foregoing, the Court finds that in choosing a trade dress for its TYLENOL PM product, McNeil acted in bad faith. Consequently, the Court finds in favor of Bristol–Myers on this factor of the "junior user's good faith."

*(7) Quality of the Junior User's Product:*

■ "If the quality of the junior user's product is of a low quality, the senior user's interest in avoiding any confusion is heightened" (*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc., supra*, 559 F.Supp. at p. 1199). The fact that both EXCEDRIN PM and TYLENOL PM are high-quality products is not disputed. However, the lack of marked difference in quality between goods supports the inference that they emanate from the same source (*Centaur Communications v. A/S/M Communications, supra*, 830 F.2d at p. 1228; *see also Lois Sportswear, U.S.A. v. Levi Strauss & Co., supra*, 799 F.2d at p. 875).

■ In this case, the similarity of the products does "tend[ ] to increase the likelihood of confusion" despite the apparent lack of injury to Bristol–Myers' reputation (*Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486 [2d Cir.1988]; *see also Plus Products v. Plus Discount Foods, Inc., supra*, 722 F.2d at p. 1006). A senior user may sue to protect his reputation even where the infringer's goods are of top quality (*see Mobil Oil Corp. v. Pegasus Petroleum Corp., supra*, 818 F.2d at 260; *Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 [7th Cir.1983]).

Other than concluding that both products in the instant case are of the highest quality, the Magistrate Judge did not make a formal finding on this factor. Upon review of the relevant case law, this Court finds that the factor involving the quality of the junior user's product favors Bristol–Myers.

*(8) Sophistication of the Purchasers:*

The focus of this particular factor is whether consumers spend much time evaluating the product before making a purchase or whether it is considered a "grab off the shelf" product (*Goya Foods, Inc. v. Condal Distribs., Inc.*, 732 F.Supp. 453, 457 (S.D.N.Y.1990)).

"Sophistication of consumers usually militates against a finding of a likelihood of confusion" (*Centaur Communications v. A/S/M Communications, supra*, 830 F.2d

at 1228), although it might on occasion *increase* the likelihood of confusion, depending upon the circumstances of the market and the products (*see Grotian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1341–42 (2nd Cir.1975) [likelihood of confusion not eliminated by selector's degree of care where subliminal confusion between the corporate entities and the products transcends competence of even the most sophisticated consumer] ).

Bristol–Myers introduced the testimony of Dr. Benny Barak, chairman-designate of the Marketing Department of Hofstra University, who specializes in consumer behavior (Tr. 806). Dr. Barak's work has focused primarily on a theory of low-level involvement of consumers in their purchasing habits. In contrasting high-level involvement, Dr. Barak provided examples in which the "risk" factor for the consumer is greater—for example, the purchase of a new car or the selection of clothing to suit a particular lifestyle. Dr. Barak distinguished such purchases from low-level involvement, such as buying a razor or toothpaste. Dr. Barak associated the purchase of OTC analgesics with this latter category.

Relying upon recent marketing studies, Dr. Barak stated that the typical consumer spends an average of 22 minutes making purchases in the supermarket, where eighteen to twenty thousand packages are typically displayed. When asked about what effect, if any, such time pressure has on the level of consumer involvement in purchasing an analgesic product, Dr. Barak responded as follows:

"In analgesics the main consideration is, does it take care of my headache. In the case of Excedrin PM does it take care of my headache and does it—can I get to sleep.

More than 20 years of experience that consumers has [sic] had with Excedrin PM has established that. And not only the consumers using it at the time, because part of the whole phenomenon of the familiarity that one has with products is that women who were going to be, are likely to be likely purchases [sic]

of a brands such as Excedrin PM that has been around for so long would have seen it at their mother's homes, their friends' homes enough times ...

\* \* \* \* \* \*

They see Excedrin PM and it establishes familiarity.... They have established the level of familiarity which is sufficient if they were ever to have that particular problem, no need to further consider it. They can pick it.

So, in this intriguing circumstance we actually have a situation that even first time purchasers do not really have the need to thoroughly inspect the packages because they already have this background....

So, it is truly low involvement to them." (Tr. 830–831).

According to Dr. Barak's testimony, this "low involvement" of consumers in the selection of an OTC analgesic increases the likelihood of confusion. When asked his opinion regarding the marketing of TYLENOL PM and the element of confusion, Dr. Barak responded as follows:

"Q From a marketing perspective, Dr. Barak, can you from looking at the packages and you have seen the array of all the TYLENOL products and the EXCEDRIN PM products, and what is your opinion of what McNeil tried to accomplish with the packaging of TYLENOL PM? A What McNeil set out to do and I believe actually succeeded in doing is to project an image that would be as close as it could be to the EXCEDRIN PM. The language, if I can for a moment use the language that the—that in consumer behavior would use, the just noticeable differences, JND ...

Between TYLENOL PM and EXCEDRIN PM is extremely limited. On the other hand, the just noticeable differences between TYLENOL PM and TYLENOL adult analgesics is rather extreme" (Tr. 875–76).

On cross-examination, Dr. Barak acknowledged that his opinion was based on confirmatory research and not on specific original research concerning the purchase of analgesics as an example of "low in-

volvement" products. However, Dr. Barak also directed the parties' attention to the studies of Michael Ray, a Stanford University researcher who is a recognized leader in the subject of low involvement theory and who recently published an article pointing out that analgesics are a prime example of "low involvement" products.

In assessing Dr. Barak's testimony, the Magistrate Judge credited the plaintiff's theory that analgesics taken for a headache entail low-involvement purchasing (RR at p. 30). However, the Magistrate Judge went on to note that "it is questionable whether a purchaser of an analgesic *with a sleep aid* involves the same low involvement thought processes," and concluded that Dr. Barak's testimony did not sufficiently support the latter argument (RR at p. 30).

The Court is aware that there is no "bright line" rule in cases such as these. The legal effect of labeling a product with its manufacturer's name "depends or may depend on both the prominence of the label and the type of product" (*Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 [Fed.Cir.1984]). "A party is not necessarily or automatically immunized by affixing its own name or trademark to the product" (*id.* at 1147).

Purchases such as microwave ovens (*id.*), electric ranges (*Tappan Co. v. General Motors Corp.*, 380 F.2d 888 [6th Cir.1967]), and hi-fi loudspeakers (*Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304 [2d Cir.1972]), are expensive items and ordinary consumers exercise much more discriminating care before buying. Consumers who spend $100 an ounce on perfume exercise care before parting with their money (*Charles of the Ritz Group v. Quality King Distrib., supra,* 832 F.2d at p. 1323).

On the other hand, consumers buying sour cream or cookies often take little notice of a maker's name which is plainly evident to the purchaser's eye (*Kraft General Foods, Inc. v. Friendship Dairies,* 19 U.S.P.Q.2d 1691, 1991 WL 149755 [S.D.N.Y. June 26, 1991] [Conboy, J.]; *Venn v. Goedert,* 319 F.2d 812, 816 [8th Cir.1963]). "Common sense dictates that price is the crucial factor in ascertaining the depth of attention the ordinary purchaser is likely to apply to a given purchase" (*Brown v. Quiniou,* 744 F.Supp. 463, 473 [S.D.N.Y.1990]; *see Hasbro Inc. v. Lanard Toys, Ltd., supra,* 858 F.2d at p. 79). The products sold by both the plaintiff and defendant are inexpensive OTC analgesics with a sleep aid, which are not major expenditures for most purchasers when buying the 24–caplet or tablet size (*see Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc., supra,* 559 F.Supp. at p. 1200). Where a product costs less than $5, purchasers have been characterized as casual buyers, likely to devote less time and attention to making a decision to purchase the item (*see RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 [2d Cir.1979]; *Shen Mfg. Co., Inc. v. Suncrest Mills, Inc.,* 673 F.Supp. 1199, 1205 [S.D.N.Y.1987]).

The Court finds that an OTC analgesic with sleep aid is more of a "grab-off-the-shelf" product, although with an admitted increase in the degree of care exercised by the general consuming public. Although far from overwhelming, the Court finds the evidence of "sophistication of the buyer" as support for a finding of likelihood of confusion to favor Bristol–Myers.

## V. ASSESSMENT OF THE "POLAROID" FACTORS

The determination of whether a likelihood of confusion has been established is a complex one, for there clearly are factors cutting both ways (*see,* for example, *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc., supra,* 559 F.Supp. at p. 1200). The Bristol–Myers' evidence of actual confusion was less than persuasive. However, the evidence, taken cumulatively, "does allow an inference that there is some actual confusion as to source in the marketplace caused by the similarity of the rival trade dresses," and the Court draws such an inference (*Kraft General Foods, Inc. v. Friendship Dairies,* 19 U.S.P.Q.2d 1691, 1991 WL 149755 [S.D.N.Y. June 26, 1991] [Conboy, J.]).

The Court finds, after considering all of the *Polaroid* factors, that the defendant's use of the TYLENOL PM trade dress does create a likelihood of confusion for an appreciable number of consumers. In reaching this decision, the Court places primary importance on the strength of the EXCEDRIN PM trade dress, the similarity of the two trade dresses, the directly competitive nature of the products offered, the established fact of intentional copying by McNeil, and the lack of "deliberate and measured product selection by consumers" in a supermarket or pharmacy environment (*see Polaroid Corp. v. Polarad Electronics Corp., supra,* 287 F.2d 492 [2d Cir.], *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 [1961]; *Kraft General Foods, Inc. v. Friendship Dairies, supra*). Accordingly, the Court grants the plaintiff's motion for a preliminary injunction based upon the foregoing violations of the Lanham Act.

## VI. THE REMAINING STATUTORY CLAIMS

### A. *The Illinois "Anti–Dilution" Statute*

■ In light of the fact that "Illinois courts have consistently held that the protections of the Anti–Dilution Statute are unavailable to competitors" (*EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 746 F.2d 375, 380 [7th Cir.1984]), the Court confirms the Magistrate Judge's finding that Bristol–Myers cannot claim protection under the Illinois Anti–Dilution statute (Ill. Rev.Stat. ch. 140 para. 22 [Smith–Hurd 1989]; RR at p. 83).

### B. *The New York "Anti–Dilution" Statute*

■ The plaintiff also asserts a cause of action under New York Gen. Bus. Law § 368–d (McKinney 1984). This "anti-dilution" statute provides for injunctive relief for infringement of registered or unregistered marks or in cases of unfair competition, where there is likelihood of injury to business reputation or of dilution of the "distinctive" quality of a mark or trade name. Entitlement to section 368–d protection is predicated upon a showing of: (1) the existence of a mark or name "truly of

*distinctive* quality" or which has attained a secondary meaning; (2) likelihood of dilution of that mark; and, (3) predatory intent of the defendant (*see Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624–26 [2d Cir.1983] [citations omitted; emphasis in original]). To establish an anti-dilution claim, the plaintiff's mark "must be a mark of sufficient distinction to warrant the statute's special protection" (*Warner Bros. Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 248 [2d Cir.1983]). This Court has previously applied § 368–d to a trade dress infringement (*see Tripledge Products, Inc. v. Whitney Resources, Ltd., supra,* 735 F.Supp. 1154, 1165 [E.D.N.Y. 1990]).

It is interesting to note that the New York General Business Law which encompasses these various unfair competition or deceptive practices statutes is being fashioned in the federal courts where such causes of action are pendent to claims brought under the Lanham Act.

While there is varied authority in the federal district courts for the Southern and Eastern Districts of New York with respect to the applicability of § 368–d in cases of direct competition (*see, e.g., Aris Isotoner Gloves, Inc. v. Fownes Bros. & Co.,* 594 F.Supp. 15 [S.D.N.Y.1983]; *Playboy Enterprises, Inc. v. Chuckleberry Pub.,* 486 F.Supp. 414 [S.D.N.Y.1980]; *Ives Laboratories, Inc. v. Darby Drug Co.,* 455 F.Supp. 939 [E.D.N.Y.1978], *aff'd on other grounds,* 601 F.2d 631 [2d Cir.1979]; *but see E.P. Lehmann Co. v. Polk's Modelcraft Hobbies, Inc.,* 770 F.Supp. 202 [S.D.N.Y.1991]; *LeSportsac, Inc. v. K Mart Corp.,* 607 F.Supp. 183 [E.D.N.Y. 1984], *aff'd on other grounds,* 754 F.2d 71 [2d Cir.1985]; *Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779 [E.D.N.Y.1984]), the Second Circuit has not squarely addressed the question.

In *Mead Data Cent., Inc. v. Toyota Motor Sales,* 875 F.2d 1026, 1030 (2d Cir.1989), the Second Circuit stated that "as section 368–d expressly states, a plaintiff need not show either competition between its product ... and that of defendant ... or a likelihood of confusion as to the source of

the goods ..." This language does not appear to imply that § 368–d is inapplicable where there is direct competition. However, the Court finds the following language of *Mead Data* instructive:

"[t]he brief legislative history accompanying section 368–d describes the purpose of the statute as preventing 'the whittling away of an established trademark's selling power and value through "its" unauthorized use by others *upon dissimilar products*'" (1954 N.Y.Legis.Ann. 49) (emphasis supplied).

The legislative history, therefore, implies that § 368–d does not apply to products that are similar or competing.

The Court also looks to the New York State Court of Appeals decision in *Allied Maintenance v. Allied Mechanical*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977), where, in dictum, the Court stated:

"The evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade-mark or name."

(*See also Weight Watchers Intern., Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1284 [S.D.N.Y.1990]; *Business Trends Analysts v. Freedonia Group, Inc.*, 650 F.Supp. 1452, 1458 [S.D.N.Y.1987]). Based on these two decisions, the Court finds that relief is not available to Bristol–Myers under the anti-dilution statute where the infringement claimed is by a direct competitor selling a similar product.

**C. *The New York "Deceptive Acts and Practices" Statute***

 Bristol–Myers contends that by adopting a trade dress intentionally copied from EXCEDRIN PM, McNeil engaged in deceptive acts and practices prohibited by N.Y.Gen.Bus.Law § 349. This statute provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." In addition to empowering the state attorney general to sue companies on behalf of the state, this provision allows any person "who has been injured by reason of any violation of this section" to sue to enjoin the unlawful act or practice, and to recover the greater of actual damages or fifty dollars (N.Y.Gen.Bus.Law § 349[h]; *see Weight Watchers Intern., Inc. v. Stouffer Corp., supra*, 744 F.Supp. at p. 1284).

In addition to suits by individuals, corporate competitors now have standing to bring a claim under this statutory provision (*see Construction Technology, Inc. v. Lockformer Co., Inc.*, 704 F.Supp. 1212, 1222 [S.D.N.Y.1989]), so long as some harm to the public at large is at issue (*Weight Watchers Intern., Inc. v. Stouffer Corp., supra*, at p. 1285). The "gravamen of the complaint must be consumer injury or harm to the public interest" (*AZBY Brokerage, Inc. v. Allstate Ins. Co.*, 681 F.Supp. 1084, 1089 n. 6 [S.D.N.Y.1988]). In addition, the plaintiff must prove (1) that the act or practice was misleading in a material way and (2) that the plaintiff was injured. On first glance, Bristol–Myers meets this criteria.

"There is no requirement that the plaintiff show specific dollar injury, or to obtain injunctive relief that there even be pecuniary injury at all" (*see* R. Givens, *Practice Commentaries on N.Y.Gen.Bus.Law § 349*, at p. 569 [McKinney 1988]). However, Givens goes on to state:

"[m]ore of the almost equal number of federal cases in which GBL §§ 349 or 350 have been invoked, however concerned trademark or 'trade dress' infringement claims or commercial disputes involving individually negotiated contracts. These kinds of cases fall outside the original intent of §§ 349 and 350 ...

To avoid sweeping all such cases into the ambit of GBL §§ 349 and 350, the federal courts have determined that the provisions require the sort of offense to the public interest which would trigger FTC intervention under 15 U.S.C.A. § 45" (citations omitted) (*id.* at pp. 567–68).

The Court finds that the present circumstances would not trigger FTC intervention under 15 U.S.C.A. § 45. In addition, the Court finds that this case is not within the ambit of "harm to the public interest" contemplated by the statute. Specifically, the Court contrasts the present circumstances with those of *Vitabiotics Ltd. v. Krupka*, 606 F.Supp. 779 (E.D.N.Y.1984), where the court granted a preliminary injunction against a defendant who adopted the plaintiff vitamin manufacturer's exact mark and trade dress and whose vitamins allegedly contained unlawful substances (*id.* at p. 782).

In relation to EXCEDRIN PM and TYLENOL PM, there is no issue of substantially different ingredients or any risk to the public health. As did the Magistrate Judge, the Court therefore denies the request by Bristol–Myers for injunctive relief based upon N.Y.Gen.Bus.Law § 349.

### D. *Common Law Claims*

Aside from the statutory provisions, the Court notes that New York recognizes an unfair competition cause of action for "palming off" goods as those of another, which occurs when the goods of one manufacturer are offered for sale as those of another, or when it is falsely implied that there is a connection between the plaintiff's and the defendant's businesses or products (*see Shaw v. Time–Life Records*, 38 N.Y.2d 201, 206–07, 379 N.Y.S.2d 390, 395–96, 341 N.E.2d 817, 821–22 [1975]). The gravamen of an unfair competition claim for "palming off" is that the labors and expenditures of the plaintiffs have been misappropriated by the defendants, and are likely to cause confusion among the purchasing public as to the origin of the product (*see Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 [2d Cir.1980], *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 [1982]; *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 249–50 [S.D.N.Y.1990]). Additionally there must be some element or showing of "bad faith" (*see Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 [2d Cir.1980]). Finally, unlike the requirement of federal law, proof of secondary meaning need not be shown (*see Morex S.p.a. v. Design Inst. of Am., Inc.*, 779 F.2d 799, 801 [2d Cir.1985], citing *Perfect Fit Indus., Inc. v. Acme Quilting Co., supra*, 618 F.2d at pp. 952–53).

Even if the purchasing public did not associate the trade dress of the plaintiff's product with a specific manufacturer, *i.e.*, Bristol–Myers, the plaintiff nevertheless would be entitled to preliminarily enjoin the defendants for the deliberate copying or imitation of its trade dress if there is a likelihood of confusion as between the two products (*see Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 [2d Cir.1981]).

The Court notes that there has been a sufficient showing of likelihood of confusion among the purchasing public as well as "bad faith" to support Bristol–Myers' claim of "palming off" or "misappropriation" under New York law. The plaintiff has shown a likelihood of success on the merits of its claim of unfair competition entitling Bristol–Myers to a preliminary injunction.

The Court finds that Bristol–Myers has also met the required elements of an action for unfair competition based on trade name or trademark infringement under Florida common law. Bristol–Myers has alleged and proved: (1) that it is the prior user of the EXCEDRIN PM trade dress; (2) that the EXCEDRIN PM trade dress has acquired secondary meaning; (3) that McNeil is using a "confusingly similar trade name or service mark to identify similar services rendered (or similar goods marketed) by it in competition with the plaintiff in the same trade area in which plaintiff has already established its trade name"; and (4) likely consumer confusion as to the source or sponsorship of McNeil's goods (*American United Life Ins. Co. v. American United Ins. Co.*, 731 F.Supp. 480, 486 [S.D.Fla.1990], *quoting American Bank of Merritt Island v. First American Bank and Trust*, 455 So.2d 443, 445–46 [Fla. 5th Dist.Ct.App.1984], *rev. denied*, 461 So.2d 114 [1985]).

Since Bristol–Myers has established likelihood of confusion, it is entitled to a preliminary injunction under the Florida common law of unfair competition.

## VII. McNEIL'S DEFENSE OF LACHES

 McNeil contends that the plaintiff's delay in seeking this preliminary injunctive relief constituted laches. Even though delay may not rise to the level of "laches," it may nonetheless indicate the absence of irreparable harm (*see Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 [2d Cir.1985]). As the Second Circuit noted in a trademark infringement action:

> "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action. *Gilette Co. v. Ed Pinaud, Inc.*, 178 F.Supp. 618, 622 (S.D.N.Y.1959). *Accord LeSportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y.1979)."

(*Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 [2d Cir.1985]).

The Court finds that the plaintiff did not delay to such an extent that laches is a bar to the preliminary injunctive relief sought. The record demonstrates that in the time period prior to the commencing this action, the plaintiff conducted an extensive investigation in order to gather the necessary facts required to support this complex action. (*See, for example, Borey v. National Union Fire Ins. Co.*, 934 F.2d 30 [2d Cir. 1991] ["undue delay" of three years]; *Gilder v. PGA Tour, Inc.*, 936 F.2d 417 [9th Cir.1991] [the Court found the plaintiffs had pursued their claim with reasonable diligence in taking five to seven months to file for a preliminary injunction]).

## VIII. CONCLUSIONS OF LAW

In seeking a preliminary injunction on a Lanham Act claim, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm (*see Church of Scientology Int'l v. Elmira Mission*, 794 F.2d 38, 41 [2d Cir.1986]; *In re Vuitton et Fils, S.A.*, 606 F.2d 1, 4 [2d Cir.1979]). Bristol–Myers has demonstrated the likelihood of confusion due to McNeil's use of a similar trade dress on its analgesic-with-sleep-aid product.

In this case, threat of irreparable harm due to consumer confusion is particularly acute because the products contain virtually identical ingredients and are sold in proximity in the very same stores. Bristol–Myers competes with McNeil in each of its locations by selling analgesics as well as EXCEDRIN PM and TYLENOL PM to the consuming public.

The Court further finds that Bristol–Myers has demonstrated a likelihood of success on the merits. Beyond the intentional copying established here, Bristol–Myers has shown that its market position and promotional investment will be irreparably damaged without a preliminary injunction (*see Kraft General Foods, Inc. v. Friendship Dairies*, 19 U.S.P.Q.2d 1691, 1991 WL 149755 [S.D.N.Y. June 26, 1991] [Conboy, J.]). The loss of good will and reputation cannot be compensated adequately by the award of money damages (*National Lampoon, Inc. v. American Broadcasting Co., Inc.*, 376 F.Supp. 733 [S.D.N.Y.], *aff'd per curiam*, 497 F.2d 1343 [2d Cir.1974]).

Consumer confusion will continue to cause diversion of sales from Bristol–Myers that is impossible to measure (*see Kraft General Foods, Inc. v. Friendship Dairies, supra*). The continued presence of the imitative TYLENOL PM trade dress in the health and pharmacy sections of supermarkets and drugstore chains will erode the uniqueness of the EXCEDRIN PM mark, in which Bristol–Myers has made a substantial investment over the last twenty years (*id.*).

The Court finds that Bristol–Myers on this record has shown irreparable harm and a likelihood of success on the merits and is entitled to a preliminary injunction (*Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 [2d Cir.1979]).

The Court therefore finds that:

1) the plaintiff Bristol–Myers has established, by clear and convincing evidence that the trade dress of EXCEDRIN PM has acquired secondary meaning;

2) the plaintiff Bristol–Myers has established, by clear and convincing evidence, that a likelihood of confusion exists relative to the consuming public concerning the trade dress of EXCEDRIN PM vis-a-vis the trade dress of TYLENOL PM;

3) the plaintiff Bristol–Myers has established by clear and convincing evidence, both (a) irreparable harm, and (b) a likelihood of success on the merits.

## IX. CONCLUSION

Based upon the foregoing, the motion of the plaintiff Bristol–Myers Squibb Company for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) is granted, to the following extent:

(1) the defendant McNeil–P.P.C. Inc. is preliminarily enjoined, pending the outcome of this action, from using, selling, offering for sale, and distributing the analgesic product in the trade dress involved in this case, namely TYLENOL PM in both tablet and caplet form;

(2) the defendant McNeil is directed to recall all advertising bearing the TYLENOL PM trade dress at issue;

(3) all future advertising by defendant McNeil as to the products at issue is enjoined.

The plaintiff's request for an order directing defendant McNeil to recall all such products and packaging bearing the TYLENOL PM trade dress and "PM" mark and to deliver up for destruction all packaging, labels, and printing plates with the "PM" mark is denied.

Pursuant to Fed.R.Civ.P. 65(c), the parties are directed to appear for oral argument and/or a hearing on March 2, 1992, at 9 a.m., to determine the amount of security to be posted by the plaintiffs for the continuation of this preliminary injunction. At that time, in order to avoid unnecessary damage to the defendant, the Court will set an early trial date, subject to the Court's present calendar.

SO ORDERED.